[Civ. No. 60190. Second Dist., Div. Four. Dec. 4, 1980.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
PHILLIP BENJAMIN GUNN, Real Party in Interest.

COUNSEL

John K. Van de Kamp, District Attorney, Harry B. Sondheim and John W. Messer, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Wilbur F. Littlefield, Public Defender, Dennis A. Fischer, Francis J. Bardsley and Dean R. Gits, Deputy Public Defenders, for Real Party in Interest.

OPINION

**FILES, P. J.**—This proceeding was brought here under Penal Code section 1538.5, subdivision (o), to review a pretrial order of the superior court suppressing as evidence a gold ring (exhibit 8) which had been taken from Phillip Gunn (a defendant charged with murder) upon the ground of illegal search and seizure. The evidentiary facts relevant to this issue are not in dispute and will be summarized.

On January 29, 1979, Officers Davis and Petroski undertook investigation of a homicide which had been committed early that morning. By February 5, 1979, they had the confession of an accomplice who said that the fatal shot had been fired by a man named Phillip Gunn, and they had found Phillip Gunn's fingerprint on the gun which had fired the fatal shot. At 10 p.m. on February 5 they learned that a man named Phillip Gunn had been arrested that day for possession of cocaine and was being held at the Parker Center jail. At 11 p.m. the officers went to the jail "and asked to see his property and booking card and to see if it was the same Phillip Gunn."

The investigating officers were familiar with the practice of placing a prisoner's property in a transparent plastic bag, which would also contain a copy of the booking card, on which would appear the prisoner's name, address and age, and a listing of each item of property which the prisoner had in his possession at the time of booking. These bags are kept in an open bin, "more of a cupboard."

The bag containing Phillip Gunn's property was sufficiently transparent that the officers were able to see its contents before opening it. After they observed "one particular ring" they opened the bag and took it out. That ring remained in the possession of the officers until the preliminary examination of the defendant Phillip Gunn, at which the widow of the homicide victim identified that ring as one which her husband had been wearing before his death. It was stipulated that the ring, exhibit 8, had been found on the person of the defendant at the time of his arrest.

In the superior court the defendant moved to suppress the ring as evidence upon the ground that it had been obtained by an illegal search and seizure. On July 16, 1980, the superior court granted the motion, and this proceeding to review that ruling followed.

There is no argument here that the defendant was not lawfully held in custody on the cocaine charge following his arrest at 12:45 a.m. on February 5, 1979. The decision of the superior court was based entirely upon the theory that the homicide investigators' observation of the ring and their seizure of the ring in the jail were unlawful.

The legality of the booking search is well established in California law and in federal constitutional law. The rationale for that procedure

is explained in *People* v. *Maher* (1976) 17 Cal.3d 196, 200-201 [130 Cal.Rptr. 508, 550 P.2d 1044]: "...Traditionally it was recognized that a person being processed for incarceration could be searched. The purpose was three-fold: to maintain jail security, to discover evidence pertaining to the crime charged, and to safeguard the prisoner's personal belongings. At common law the search was not necessarily related to the right to search incident to arrest, but was considered a lawful and customary jail detention routine. (Gardner & Manian, Principles and Cases of the Law of Arrest, Search, and Seizure (1974) p. 200.) Courts today still employ the same rationale in upholding these searches, citing the need to provide for the safety of police personnel and other prisoners, to prevent the introduction of weapons and contraband into the jail, and to inventory the entering prisoner's property. [Citations.] The rationale behind these security measures is obvious: in a jail setting, a substantial number of persons are involuntarily confined for varied periods throughout a vast facility where constant supervision is not feasible."

The duty of the sheriff to take charge of and safely keep the property of a prisoner is codified in Government Code section 26640.[1]

The scope of the jailer's authority over the property is described in *People* v. *Rogers* (1966) 241 Cal.App.2d 384, 389-390 [50 Cal.Rptr. 559]: "...Once articles have lawfully fallen into the hands of the police they may examine them to see if they have been stolen, test them to see if they have been used in the commission of a crime, return them to the prisoner on his release, or preserve them for use as evidence at the time of trial. (*People* v. *Robertson*, 240 Cal.App.2d 99, 105-106 [49 Cal. Rptr. 345].) During their period of police custody an arrested person's personal effects, like his person itself, are subject to reasonable inspection, examination, and test. (*People* v. *Chaigles*, 237 N.Y. 193 [142 N.E. 583, 32 A.L.R. 676], Cardozo, J.) Whatever segregation the police make as a matter of internal police administration of articles taken from a prisoner at the time of his arrest and booking does not derogate

---

[1]Government Code section 26640: "The sheriff shall take charge of, safely keep, and keep a correct account of, all money and valuables found on each prisoner when delivered at the county jail. Except when otherwise ordered by a court of competent jurisdiction, the sheriff shall pay such money or sums therefrom and deliver such valuables or portions thereof as the prisoner directs and shall pay and deliver all the remainder of his money and valuable to the prisoner or to his order upon his release from the jail or to his legal representative in case of his death or insanity."

the fact of their continued custody and possession of such articles." (Accord: *People* v. *Gilliam* (1974) 41 Cal.App.3d 181, 189 [116 Cal. Rptr. 317].)

The case law includes a number of precedents for police examination and testing of property which is seized as an incident of the arrest or in the course of booking.

In *People* v. *Teale* (1969) 70 Cal.2d 497 [75 Cal.Rptr. 172, 450 P.2d 564], the defendant was arrested while sitting in an automobile in Louisiana. The vehicle was brought to California where it was examined for evidence of the California crimes with which the defendant was charged. The Supreme Court held that the scientific examination of the vehicle, undertaken 10 days after defendant's apprehension was not unlawful, because the examination of property already lawfully in the possession of the police was neither a search nor a seizure within the meaning of the Fourth Amendment.

In *People* v. *Rogers, supra*, 241 Cal.App.2d 384, following an arrest for one burglary, the booking search turned up 10 keys. The court held that it was not improper for the police to test these keys later in the locks of a place where another burglary had been committed.

In *People* v. *Remiro* (1979) 89 Cal.App.3d 809 [153 Cal.Rptr. 89], keys removed from the defendants at the time of booking were relinquished to a police officer who was able to match them with the locks of buildings involved in the investigation. The evidence so obtained was held to be admissible.

In *People* v. *Earls* (1980) 109 Cal.App.3d 1009 [167 Cal.Rptr. 685], the defendant was arrested and jailed for a Vehicle Code violation. At the time he was booked his blue jeans were taken from him and kept with his personal property until released to a laboratory for testing. The tests turned up evidence which was used to convict him of robbery. The appellate court held the search of the jeans to be lawful, quoting *Rogers* and *Remiro.*

The rationale adopted in *United States* v. *Edwards* (1974) 415 U.S. 800 [39 L.Ed.2d 771, 94 S.Ct. 1234] is also pertinent here. In that case the clothes worn by the accused at the time of arrest and booking were thought to constitute critical evidence. The day following the arrest, Ed-

wards was given new clothing, and what he had been wearing was taken from him to be examined and held as evidence. The court said: "...It must be remembered that on both May 31 and June 1 the police had lawful custody of Edwards and necessarily of the clothing he wore. When it became apparent that the articles of clothing were evidence of the crime for which Edwards was being held, the police were entitled to take, examine, and preserve them for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered....Indeed, it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest....[¶] ■ *Caruso [United States* v. *Caruso* (2d Cir. 1966) 358 F.2d 184] is typical of most cases in the courts of appeals that have long since concluded that once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the 'property room' of the jail, and at a later time searched and taken for use at the subsequent criminal trial. The result is the same where the property is not physically taken from the defendant until sometime after his incarceration." (Fns. omitted.) (415 U.S. at pp. 806-808 [39 L.Ed.2d at pp. 777-778].)

The present case differs from *Edwards* in that the evidence retrieved after booking related not to the crime for which the prisoner had been arrested, but to an unrelated offense. But at the time the homicide investigators found the ring in the plastic bag, they already had legal cause to arrest for the offense they were investigating. It is not constitutionally significant that the formal arrest and rebooking on the murder charge followed rather than preceded the inspection of the property bag. (*People* v. *Williams* (1967) 67 Cal.2d 226, 229 [60 Cal.Rptr. 472, 430 P.2d 30]; *People* v. *Cockrell* (1965) 63 Cal.2d 659, 666-667 [47 Cal.Rptr. 788, 408 P.2d 116].)

Furthermore, the California case law supports the view that information obtained from the examination of the prisoner's effects may be used for other purposes than proof of the offense for which the prisoner

had been arrested. For example, in *People v. Gilliam, supra*, 41 Cal. App.3d 181, a booking search turned up a credit card which connected the defendant with a robbery other than the one for which he had been arrested. The court rejected the contention that the searching officer should not have examined the card for that purpose. *People v. Rogers* and *People v. Earls*, discussed *supra*, are other examples.

■ What the homicide investigators did in this case cannot be classified as either a search or a seizure within the meaning of the Fourth Amendment. The ring was lawfully in the custody of the police. Its storage in the plastic property bag was purely for convenience and safekeeping. No expectation of privacy was involved. The ring was no more in a place of privacy than if the booking officer had left it on the counter of the booking desk.

*People v. Smith* (1980) 103 Cal.App.3d 840 [163 Cal.Rptr. 322], relied upon by defendant, deals with significantly different facts. In that case Officer Stafstrom made a postbooking search of the purse of a woman who was a prisoner in a county jail, and recovered evidence from inside a wallet which was inside the purse. In holding that search was unlawful, the *Smith* court said: "The only argument to be made is that Harris' privacy interest in the items seized by Stafstrom was so dissipated by the first search as to render the 'second look' inconsequential, i.e., *not a search*, from the standpoint of the Fourth Amendment. [¶] Cases in other jurisdictions in which the issue has been considered are in conflict. The question is not settled by *Edwards*. We conclude that since the officer's purpose in inspecting Harris' purse and wallet a second time was to look for at least one item not previously noted (the current address), and items whose evidentiary value had not been previously appreciated (the address and keys), the inspection involved an intrusion into whatever vestige of privacy remained to Harris and thus did constitute a search." (103 Cal.App.3d at p. 845.)

The holding of the *Smith* court that a wallet inside a woman's purse enjoys a "vestige of privacy" follows the reasoning of the cases which distinguish between the lawful search of an automobile and the unlawful search of a closed footlocker or suitcase. (See *United States v. Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476]; *Mozzetti v. Superior Court* (1971) 4 Cal.3d 699 [94 Cal.Rptr. 412, 484 P.2d 84].)

But the "vestige of privacy" approach of the *Smith* case has no applicability to a ring which was in plain sight when seized, and which was stored, not in a purse, but in a bag provided by the jailer for convenience and safekeeping while in the jailer's custody.

We recognize that the *Smith* opinion contains language which might be applied to all property in police custody after completion of the booking process.[2] However, the issue decided there was the legality of a search of a purse, and not, as here, the retrieval of an article which had never been in any private place after its lawful seizure as a part of the booking process. By reason of this difference in facts, we need not consider whether the *Smith* holding can be reconciled with the authorities cited above.

Defendant makes an argument based upon *Mozzetti v. Superior Court, supra,* 4 Cal.3d 699, that the plastic bag in which the jailer had placed defendant's property should be accorded the same privacy as the suitcase which was found in Mozzetti's automobile. That argument simply disregards reality. Mozzetti's suitcase was in fact a private container. The plastic bag was no more than a means of segregating articles which were in the jailer's custody, where no one could have a reasonable expectation of privacy.

Defendant's other contention rests on the fact that the People failed to show that the ring was not in a hidden place—such as a pocket—when he was arrested. The record contains a stipulation that the ring was found "on the person of defendant." This argument overlooks the nature of a lawful booking search. The case law on booking searches establishes that the jailer is under a duty to take custody of whatever is on the person of the prisoner, whether or not then in plain view. (See e.g., *People v. Harris* (1980) 105 Cal.App.3d 204, 214 [164 Cal.Rptr. 296] (contents of purse); *People v. Balassy* (1973) 30 Cal.App.3d 614, 623 [106 Cal.Rptr. 461] (contents of wallet).

---

[2]For example, the *Smith* court said: "His appeal thus presents a question novel to this jurisdiction: once an arrestee's personal effects have been inventoried and inspected during a booking search, do they remain 'fair game,' that is, subject to warrantless searches, without probable cause for the period of incarceration?" (Fns. omitted.) (103 Cal.App.3d at p. 843.)

If the *Smith* court meant to imply that the answer to that rhetorically phrased question was "no," the court was rejecting the rationale of the *Edwards* case, quoted above, as well as the rationale of *Teale* and the holdings of *Rogers* and *Remiro,* supra.

The retrieval of the ring from the plastic bag in which the jailer had stored it was not unlawful. Let a peremptory writ of mandate issue requiring the respondent court to vacate its order of July 16, 1980, insofar as it suppresses the ring (exhibit 8) as evidence, and make a different order denying the defendant's motion to suppress it.

Kingsley, J., and Woods, J., concurred.

A petition for a rehearing was denied January 2, 1981, and the petition of real party in interest for a hearing by the Supreme Court was denied January 28, 1981.