[No. C001631. Third Dist. May 17, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID DOMINGUEZ, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

* Pursuant to rule 976.1 of the California Rules of Court, the Reporter of Decisions is directed to publish all portions of this opinion except part II and the appendix to part II.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Thomas L. Carroll, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, W. Scott Thorpe and Clayton S. Tanaka, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SPARKS, Acting P. J.**—This case presents issues relating to the validity of a booking search of a murder suspect at the county jail. Convicted of two murders, defendant claims that the search was motivated by improper investigatory police motives and consequently exceeded the permissible scope

of such an administrative search. We find the claim untenable and affirm the judgment.

On the evening of September 29, 1984, defendant fatally shot two male acquaintances. Charged with their murders, a jury found the defendant guilty of a murder in the first degree in the first killing and a murder in the second degree in the second. (Pen. Code, §§ 187, 189.) The jury further found that defendant personally used a firearm in the commission of the murders. (Pen. Code, § 12022.5, subd. (a).) They also found as a "special circumstance" that he was guilty of more than one count of murder, at least one of which was in the first degree. (Pen. Code, § 190.2, subd. (a)(3).) For the first degree murder with special circumstances, the trial court sentenced defendant to state prison for life without possibility of parole plus two years for the use enhancement. On the second degree murder count, the court imposed "the term prescribed by law," namely 15 years to life. The court further imposed the firearm use enhancements consecutive to the murder terms.

In the published portion of this opinion we reject defendant's contention that the police illegally seized and read incriminating documents in his possession at the time of his booking at the Placer County Jail. In the unpublished part we also reject his other argument that prosecutorial misconduct was sufficiently prejudicial to mandate reversal of his convictions.

The nature of the defendant's challenges renders superfluous any extended exegesis of the facts underlying the killings. It is sufficient to note the jury accepted the testimony of several witnesses and the prior inconsistent statement of the defendant's girlfriend. This testimony revealed that on the night in question in the City of Roseville, in a confrontation over money, the defendant fatally shot Jesse Laumbach point-blank, walked toward Jesse's younger stepbrother, Lazaro Quiroz, who was crouching behind a fence, and fatally shot him as well. Defendant then returned to the body of the first victim and shot him again. Additional facts necessary for an understanding of the issues will be incorporated in the discussion.

I

■ Prior to trial, the defendant moved to suppress evidence which had been obtained from him at the time of his booking. (Pen. Code, § 1538.5.) The following facts are derived from the testimony adduced at the hearing on the motion.

Three days after the shootings defendant surrendered himself to the police at the Roseville Police Station. Arrested for the murders, he was

processed by booking clerk Harvey Gould. The booking procedure, Gould testified, "is to type a booking sheet listing all properties brought in with the subject, pertinent information to that subject; and then he is either photographed, fingerprinted, and allowed phone calls, finally placed into a cell." Pursuant to this procedure, Gould had the defendant empty his pockets. Essentially, the sole contents of his pockets were several folded newspaper clippings discussing the murders and a tube of heavy manila paper two to three inches long rolled to the thickness of a pencil and tied with white ribbon.

Roseville Police Detective James Fujitani arrived about five minutes later. Almost immediately upon Detective Fujitani's arrival, the defendant made a couple of incriminating remarks. Gould had finished recording the contents of the pockets and had moved on to collecting information from the defendant. Detective Fujitani saw the clippings and noticed they were about the killings. He asked defendant about the roll and he replied that it was a letter. The detective then asked if he could see it; defendant expressed a preference the officer not look at it. Detective Fujitani then asked if he could look at it later; when he got no answer, he put the roll down. Detective Fujitani told Gould he wanted to keep some of the items as evidence, but did not specify which ones. Nonetheless, he wanted to seize the roll and clippings as evidence. Although the roll and clippings were among the items in which he was interested, the only items he physically separated from the pile were articles of clothing worn by defendant. He took defendant away to be interrogated. While he was gone, Gould put all items save the articles of clothing in a clear plastic bag and put the bag in the property locker.

Shortly afterwards defendant and his property bag were transported to the Placer County Jail in Auburn by Detective Fujitani and his partner. They gave the booking clerk at the jail the bag of items and Detective Fujitani said he wanted some of the items inside as evidence. The clerk opened the bag, dumped the contents on the counter and began to inventory the items. As the clerk did so, Detective Fujitani set the clippings and the roll aside on the counter. The detective testified he had not taken those items earlier because they had been booked into a locked cabinet and he thought he needed a warrant once they had been bagged and put into the property locker at the Roseville Police Department. In any event, his partner picked up the roll, unwrapped it, and read it. Incredible as it may seem, the letter was a signed, handwritten confession to the murders.[1] The clippings were also seized.

---

[1] The confession read: "To whom it may concern.
MUST SEE JESUS.
I David Dominguez being of sound mind I write this note of statement to declare my guiltynest [*sic*] of the silent sleep of Jesse & Lazaro Lambach [*sic*] which at that time I sneakely [*sic*]

The prosecutor sought to justify the seizure under *Illinois* v. *Lafayette* (1983) 462 U.S. 640 [77 L.Ed.2d 65, 103 S.Ct. 2605], as incident to defendant's booking. The trial court denied the motion "on both the ground that the federal law allowed the late booking search (*U. S.* v. *Edwards* [(1974) 415 U.S. 800 [39 L.Ed.2d 771, 94 S.Ct. 1234]]), and the ground that the doctrine of inevitable discovery (under both federal and California law) would have obtained the property for the People (*People* v. *Young* [(1984) 159 Cal.App.3d 138 [205 Cal.Rptr. 402]█], and *Nix* v. *Williams* [(1984) 467 U.S. 431 [81 L.Ed.2d 377, 104 S.Ct. 2501]])."

Defendant claims on appeal that the seizure of the items and the reading of the letter were not incident to his booking because the decision to seize and inspect them had been made prior to, and did not result from, the inventory of his property. Consequently, so the argument goes, this seizure without a warrant of the contents of the roll did not come within any of the "carefully circumscribed exceptions" to the rule that a warrantless search is "per se unreasonable" under the California and federal Constitutions. (*People* v. *Laiwa* (1983) 34 Cal.3d 711, 725 [195 Cal.Rptr. 503, 669 P.2d 1278].)

Since this is a post-Proposition 8 crime, the admissibility of the seized written confession and clippings is governed by federal constitutional standards. "What Proposition 8 does is to eliminate a judicially created *remedy* for violation of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent that exclusion remains federally compelled." (*In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744]; italics in original.) We turn then to those federal standards.

The United States Supreme Court has declared that "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." (*Colorado* v. *Bertine* (1987) 479 U.S. 367, 371 [93 L.Ed.2d 739, 745, 107 S.Ct. 738].) We briefly recount the cases establishing that exception. In 1976, the United States Supreme Court held that inventory searches of automobiles did not violate the Fourth Amendment. (*South Dakota* v. *Opperman* (1976) 428 U.S. 364 [49 L.Ed.2d 1000, 96 S.Ct. 3092].) There the police conducted a routine inventory search of an automobile lawfully impounded for violations of municipal parking ordinances. The officers found marijuana in the glove compartment. The question was

---

took the gun being a 22 cal. hand gun without consent and or without permission of the owner. The truth has been writen [*sic*] and there is no mistake.
[Obliterated signature]
P.S. Let it be heard & I'm your prisoner."

whether this inventory violated the Fourth Amendment. The high court noted that "[a]pplying the Fourth Amendment standards of 'reasonableness,' the state courts have overwhelmingly concluded that, even if an inventory is characterized as a 'search,' the intrusion is constitutionally permissible." (*Id.,* at pp. 369-371 [49 L.Ed.2d at pp. 1005-1006], fns. omitted.) The court then concluded "that in following standard police procedures, prevailing throughout the country and approved by the overwhelming majority of courts, the conduct of the police was not 'unreasonable' under the Fourth Amendment." (*Id.,* at p. 376 [49 L.Ed.2d at p. 1009].)

The high court extended that rationale to booking searches in *Illinois* v. *Lafayette, supra,* 462 U.S. 640 [77 L.Ed.2d 65]. In *Lafayette,* a police officer conducted an inventory search of the contents of a shoulder bag in the possession of a suspect being taken into custody. "The question here," the *Lafayette* court said, "is whether, consistent with the Fourth Amendment, it is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police stationhouse incident to booking and jailing the suspect. The justification for such searches does not rest on probable cause, and hence the absence of a warrant is immaterial to the reasonableness of the search." (*Id.,* at p. 643 [77 L.Ed.2d at p. 69].) For a whole host of reasons, the court concluded that "[a]t the station house, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed." (*Id.,* at p. 646 [77 L.Ed.2d at p. 71].) The court noted it had upheld an inventory search in *Opperman.* "We held that the search was reasonable because it served legitimate governmental interests that outweighed the individual's privacy interests in the contents of his car. Those measures protected the owner's property while it was in the custody of the police and protected the police against possible false claims of theft. We found no need to consider the existence of less intrusive means of protecting the police and the property in their custody—such as locking the car and impounding it in safe storage under guard. Similarly, standardized inventory procedures are appropriate to serve legitimate governmental interests at stake here." (*Id.,* at p. 647 [77 L.Ed.2d at pp. 71-72].) Consequently, the court held "that it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." (*Id.,* at p. 648, fn. omitted [77 L.Ed.2d at p. 73].)

The California Supreme Court reached the identical conclusion with respect to both the state and federal constitutions in the recent cases of *People* v. *Hovey* (1988) 44 Cal.3d 543 [244 Cal.Rptr. 121, 749 P.2d 776], and *People* v. *Miranda* (1987) 44 Cal.3d 57 [241 Cal.Rptr. 594, 744 P.2d 1127]. In *Miranda,* a pre-Proposition 8 case, an officer discovered an

unsealed envelope inside defendant's pocket during a booking search. The officer opened the envelope and discovered a letter written by defendant to his mother in which he exclaimed, " 'Mother, it's me the killer!' " (*Id.,* at p. 80, fn. 7.) The *Miranda* court held that "[a] search of the personal effects of an arrested person at the time of booking is a reasonable search under the California and federal Constitutions." (*Id.,* at p. 81.) The permissible scope of a booking search, the court went on, "is broad: it may 'involve an item-by-item examination of everything in the arrestee's pockets or otherwise on his person, including looking into his wallet or into containers on the person; it may even extend to a strip search.' " (*Id.,* at p. 81, quoting 2 LaFave, Search and Seizure (2d ed. 1987) § 5.3(a), p. 482.)

In *Hovey,* another pre-Proposition 8 case, the high court held that it was permissible to read contents of defendant's wallet during a second booking search even if not examined during the first booking search. (44 Cal.3d at pp. 570-571.) There defendant was arrested and taken to the Hayward jail where an inventory of his belongings, including his wallet, was conducted. Thereafter he was transferred to the Albany jail where his property was reinventoried. Incriminating documents were seized and used against him. The court noted that the United States Supreme Court had held in *Illinois* v. *Lafayette, supra,* 462 U.S. 640, that inventory searches into closed containers are constitutionally permissible if conducted as part of the booking process. The *Hovey* court further noted it had "recently adopted *Lafayette's* holding in *People* v. *Miranda* (1987) 44 Cal.3d 57, 80-82 . . . " (*Id.,* at p. 571.) Defendant also challenged on appeal the "second look" at his papers when he was transferred to the Albany jail. "But we see," the court responded, "no compelling reason for holding that, on transfer of a suspect to another facility, a second booking search may not be conducted. There is no indication that the transfer was made for purposes of conducting an additional search of defendant's papers." (*Ibid.*)

Defendant argues that the officers in this case developed an investigatory intent after the first booking search and this intent somehow nullified the propriety of the search pursuant to the second booking. He concedes that in *Illinois* v. *Lafayette, supra,* 462 U.S. 640, the United States Supreme Court affirmed the legitimacy of an administrative search of the personal effects of a person under lawful arrest when the search is incident to his incarceration. But in defendant's view, an investigatory intent does not comport with the rationales suggested by the high court in *LaFayette* as justifying booking searches. He argues that the confession was illegally discovered as a result of what he calls "investigatory police motives" and not as a result of a legitimate administrative search at the Placer County Jail. He cites to language in *South Dakota* v. *Opperman, supra,* 428 U.S. at p. 376 [49 L.Ed.2d at p. 1009] suggesting an inventory search will be invalidated if it "was a

pretext concealing an investigatory police motive." The language has no application here. The subterfuge with which the Supreme Court was concerned would have been either a *noncustomary* booking search not in accordance with procedures or an initially *unjustified* seizure of the property for the purpose of searching it. It is only when officers act in bad faith or for the sole purpose of investigation that an inventory search becomes suspect. (*Colorado* v. *Bertine, supra,* 479 U.S. at pp. 372-373 [93 L.Ed.2d at p. 746].) But when the inventory is not conducted solely for investigative purposes but is part of the customary booking procedure, it is deemed reasonable under the Fourth Amendment.

There was no evidence here that the inventory procedure at either police headquarters or at the county jail was pretextual or undertaken in bad faith. Nor is there any prohibition under the Fourth Amendment against inspecting an inventoried item to ascertain its nature. The California Supreme Court made this clear in *Hovey.* As we have recounted, there an Albany officer reinventoried defendant's property. "The various papers in defendant's possession were examined by Sergeant Stirling, who was *investigating* the Albany kidnapping . . . ." (*Hovey,* 44 Cal.3d at p. 570; italics added.) Among those papers was a wrecking company's receipt for a 1961 Ford car. The officer inspected this receipt because he thought this car might match the vehicle described in a murder case in Alameda County. Defendant claimed on appeal that the officers exceeded the permissible scope of a routine warrantless booking search when they examined the papers contained in his wallet. He argued that "jail security and other legitimate concerns can be adequately maintained by simply storing closed containers such as wallets, rather than opening and 'probing' their contents." (*Ibid.*) The court rejected "defendant's contention that the officers should not have *read* the papers discovered in defendant's wallet, after finding no weapons or contraband. A reasonably complete inventory would include identifying the document seized and, like the letter in *Miranda,* it was necessary to read the car receipt in order to properly identify and inventory it." (*Id.* at p. 571; italics in original.)

The fact that an investigating officer read the note rather than the inventorying deputy is of no moment. The constitutionality of a booking search does not rise or fall on such niceties. So long as the property is being lawfully inventoried, it may be inspected by any law enforcement officer so long as it assists the inventorying process by identifying the document. For constitutional purposes, the intrusion is the same no matter who the reader is. We conclude that officers acted reasonably in reading the roll and consequently did not impinge upon defendant's Fourth Amendment rights.

In any event, even if the Roseville officers somehow exceeded the permissible bounds of the inventory procedure, the trial court's alternate ruling of

inevitable discovery would be fatal to defendant's contention. Since the prosecution sought to justify the search as incident to defendant's booking, the trial court's alternate holding of inevitable discovery inferentially means that the confession would have been discovered by the booking officer if it had not earlier been read by the Roseville officer. ■ In a suppression motion "the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court." (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) Consequently, if an inference is permissible under the evidence and it upholds the trial court's decision, we must presume that the trial court drew it. Thus, we must "view the facts upon which the suppression motions were submitted in the light most favorable to the People, drawing therefrom all reasonable inferences in support of the trial court's order denying the motions." (*People* v. *Mack* (1977) 66 Cal.App.3d 839, 846 [136 Cal.Rptr. 283].) The inference that the booking deputy would have discovered the confession on his own if the Roseville officers had not been there, if not compelled, is surely a reasonable one. From this it follows that the trial court also correctly denied the motion to suppress on grounds of inevitable discovery.[2]

## II*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed.

Sims, J., and Marler, J., concurred.

A petition for a rehearing was denied June 10, 1988, and appellant's petition for review by the Supreme Court was denied August 11, 1988.

---

[2] In light of our holding sustaining the booking search, we have no occasion to consider the defendant's other contentions, including what vestiges of Fourth Amendment protections continue to adhere to the belongings of one in jail once the booking process is completed. (See *United States* v. *Edwards*, (1974) 415 U.S. 800, 808, fn. 9 [39 L.Ed.2d 771, 778, 94 S.Ct. 1234]; *People* v. *Superior Court (Gunn)* (1980) 112 Cal.App.3d 970 [169 Cal.Rptr. 559]).

* See footnote, *ante,* page 345.