[No. C031599. Third Dist. Oct. 26, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
BRUCE CHARLES DAVIS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV, V, VI, VII, VIII and IX.

COUNSEL

Jeffrey J. Stuetz, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and John A. O'Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HULL, J.**—Defendant was convicted by a jury of two counts of robbery (Pen. Code, § 211) and was found to have committed five prior serious felonies within the meaning of the three strikes law (Pen. Code, § 667, subds. (b)-(i)). Sentenced to two consecutive terms of 25 years to life plus enhancements totaling 10 years, defendant appeals claiming various instructional, evidentiary and sentencing errors. Defendant also challenges the denial of his suppression and severance motions.

In the published portion of this opinion, we conclude a belated, warrantless seizure of items from defendant's property stored in the jail property room did not violate the Fourth Amendment. In the unpublished portion of the opinion, we reject defendant's other contentions. We affirm.

### FACTS AND PROCEDURAL HISTORY

On January 20, 1998, Helua Rashed was working as a teller in a Wells Fargo Bank office inside an Albertson's food store at the corner of Gerber and Power Inn Roads in Sacramento. At approximately 5:30 p.m., she

noticed a man standing in line waiting for service. He was African-American, five feet eight inches to five feet nine inches tall, weighing no more than 200 pounds and approximately in his 30's. He had no facial hair. The man wore a construction hard hat, dark sunglasses, and a dirty jacket. He held a white handkerchief over his mouth and coughed loudly.

Approximately two minutes after the man arrived at the bank, he came and sat across the counter from Rashed. She asked how she could help him and he asked for change. The man handed Rashed $2 and she gave him eight quarters. She noticed he was wearing a gold nugget ring. Rashed then asked if the man wanted anything else and, after a 10-second delay, he passed her a note which said, in general, "This is a robbery. Give me all your big bills, hundreds, fifties, twenties, tens." The note also said, "Do this and no one will get hurt." The man repeated this threat orally. Rashed took money out of her cash drawer and placed it on the counter. The man took the handkerchief away from his face and grabbed the money. He also retrieved the note and then departed.

Rashed could not identify defendant at trial as the perpetrator. However, she selected defendant's picture from a photographic lineup several months after the robbery. Rashed also identified a ring that had been seized from defendant at the time of his arrest as similar to the one worn by the robber. Rashed denied having seen defendant in the bank between January 20 and January 24, 1998, without the disguise and specifically did not recall closing an account for him at the bank on January 24. She, in fact, denied working at the bank that day.

On January 30, 1998, Cristy Schultz was working as a teller at a U.S. Bank branch on Florin Road in Sacramento. At approximately 5:30 p.m. a man came to her teller station wearing blue jeans, a hooded sweatshirt, an orange construction vest, dark welding goggles and a construction hard hat. He held a white tissue or napkin over his mouth and part of his nose and pretended to have a cold. The man passed Schultz a note which read, "Give me all your money and no one will get shot." She took money from her cash drawer and placed it on the counter. She also gave back the note. The man "scooped" up the money and departed.

Several employees at the bank recognized a robbery was in progress. The branch manager, Amy Mathews, ran out of the bank just after the robber departed. She saw him outside as he ran around a Dumpster and along some parked cars and then ducked between two cars. About a minute and a half to two minutes later, Mathews heard a car engine start and stepped out behind the car as it began to back out of a parking space. She wrote the license

number on a piece of paper which she had brought out with her. The car got within five feet of Mathews before being driven away.

A few minutes later defendant walked into the bank with the money that had been taken and announced he was the robber and that he was just trying to teach the bank a lesson because of its lax security. Defendant said he did not mean any disrespect but was interested in a job as a security agent for the bank. Defendant was wearing the gold ring which was later taken from him and identified by Rashed in connection with the January 20 Wells Fargo robbery.

Mathews informed defendant she was not interested in speaking with him about the matter but that he could take it up with the police who had already been summoned. Defendant appeared nervous and jumpy at that point and asked to leave. The manager acquiesced. Based on the license number taken from the robber's vehicle, police traced defendant to his home and arrested him.

Two rings were seized from defendant at the time of his arrest, inventoried and stored in the property room at the jail. Several months later, at the request of an FBI agent, the rings were retrieved from the property room. Defendant was charged with two counts of robbery and five prior serious felony convictions. His motion to suppress the rings retrieved from police storage was denied, as was his motion to suppress the photographic lineup identification by Rashed. The court also denied defendant's motion to sever trial of the two robbery counts. Defendant was eventually convicted of both robberies, and the five priors were found true. He was sentenced to two consecutive terms of 25 years to life along with enhancements totaling 10 years.

DISCUSSION

I

*Motion to Suppress*

Defendant challenges the trial court's denial of his motion to suppress the two rings taken from police storage. The rings had originally been seized from defendant upon his arrest on January 30, 1998, and inventoried as part of the booking process. At the time, the rings were placed in a clear plastic bag with defendant's other property and this bag was in turn stowed in a nylon bag. An attached document listed the contents. On March 25, 1998, Detective Troy Woodward was requested by an FBI agent to see if

there were any rings in defendant's property stored in the county jail property room. The next day, Woodward went to the property room and asked for defendant's property. The officer in charge of the property room took the plastic bag out of the nylon bag and handed the plastic bag to Woodward. Woodward reviewed the attached document and noticed two rings were listed thereon. He reached inside the plastic bag and retrieved the rings. Woodward did not have a search warrant.

Defendant contends the March 26 search violated his Fourth Amendment rights because, notwithstanding temporary possession of the property by police, defendant had a reasonable expectation of privacy which was violated. Defendant relies on *People v. Smith* (1980) 103 Cal.App.3d 840, 842-846 [163 Cal.Rptr. 322], in which the court held that a belated, warrantless search of a wallet inside a purse seized from an arrestee at the time of booking violated the Fourth Amendment. In *Smith*, the defendant's mother had been arrested and the following day officers searched her belongings in police storage in an effort to ascertain defendant's whereabouts. The court concluded: "[S]ince the officer's purpose in inspecting Harris'[s] purse and wallet a second time was to look for at least one item not previously noted (the current address), and items whose evidentiary value had not been previously appreciated (the address and keys), the inspection involved an intrusion into whatever vestige of privacy remained to Harris and thus did constitute a search." (*Id.* at p. 845.) In *People v. Laiwa* (1983) 34 Cal.3d 711, 727 [195 Cal.Rptr. 503, 669 P.2d 1278], the state high court cited *Smith* for the proposition that "the legitimate purposes of the booking search exception do not justify a belated search conducted after the booking process has ended . . . ."

Defendant's reliance on *Smith* and the Supreme Court's passing reference to *Smith* in *Laiwa* is misplaced. *Smith* does not stand for the broad proposition that jail inmates retain a Fourth Amendment privacy interest in property seized upon arrest and stored in the jail property room. On the contrary, the *Smith* court explained the Fourth Amendment violation there was based on the fact the officers searched through a purse and wallet in the defendant's mother's property for items which had not previously been noted or whose evidentiary value had not previously been appreciated. (*People v. Smith, supra,* 103 Cal.App.3d at p. 845.) The officers looked inside the mother's purse and wallet hoping to find two items, the defendant's address and keys to a stolen vehicle. They found both inside a wallet in the purse. (*Ibid.*)

The key distinction between *Smith* and the present matter is that when Detective Woodward opened the plastic bag he was already aware the rings were inside by virtue of the inventory prepared at the time of booking. In

other words, Woodward did not conduct a search but merely retrieved items, lawfully obtained, that law enforcement knew were in its possession.

In *People v. Superior Court (Gunn)* (1980) 112 Cal.App.3d 970 [169 Cal.Rptr. 559], the court upheld the warrantless seizure from police storage of a ring taken from the defendant at the time of his arrest. The ring had been stored in a clear plastic bag provided by the jail. The court explained: "What the homicide investigators did in this case cannot be classified as either a search or a seizure within the meaning of the Fourth Amendment. The ring was lawfully in the custody of the police. Its storage in the plastic property bag was purely for convenience and safekeeping. No expectation of privacy was involved. The ring was no more in a place of privacy than if the booking officer had left it on the counter of the booking desk." (*Id.* at p. 977.) The court distinguished *Smith* as involving a search of a closed container, the purse, rather than a clear plastic bag provided by the jail as a matter of convenience. (*Id.* at pp. 977-978.)

In *People v. Bradley* (1981) 115 Cal.App.3d 744 [171 Cal.Rptr. 487], a robbery victim informed authorities, following the defendant's arrest, that the perpetrator wore a distinctive ring. At the time, the defendant was still in custody and a ring was among his impounded possessions. The defendant's property was examined and the victim identified the ring. The court concluded the ring was properly used in evidence. (*Id.* at p. 750.) The court distinguished *Smith*, explaining: "There may be some impounded items, however, in which a defendant retains an expectation of privacy. For example, [*Smith*] held a postbooking search inside a wallet contained in the impounded purse was improper because the wallet inside the purse holds a 'vestige of privacy.' A ring worn on defendant's finger open to plain view to the victim during the robbery and properly within the custody of the sheriff after booking hardly falls within the same category. It did not have, nor can it acquire after booking, a 'vestige of privacy' requiring a search warrant." (*Id.* at p. 751.)

Federal authorities are in accord. In *U.S. v. Thompson* (5th Cir. 1988) 837 F.2d 673, the court upheld a warrantless search of the defendant's property to secure a key to a locker where explosives had been stored. (*Id.* at p. 674.) The court distinguished such search from that in *Brett v. United States* (5th Cir. 1969) 412 F.2d 401, where the authorities conducted a search of the defendant's property three days after his arrest and discovered contraband. The *Thompson* court explained: "In *Brett* the officer conducted an exploratory search of the prisoner's effects three days after he had been arrested and found cellophane papers with traces of heroin in the watch pocket of the prisoner's trousers. The second inspection was undertaken to look for something that had not been discovered at the time of the inventory. In Thompson's case, the keys were not concealed and no further exploration was

required." (*Thompson, supra,* 837 F.2d at pp. 675-676, fn. omitted; accord, *U.S. v. Turner* (9th Cir. 1994) 28 F.3d 981, 983 [seizure of a cap stored with defendant's jail property; search occurred while defendant was under arrest for unrelated charges].)

Defendant argues the present matter is controlled by *Laiwa,* a decision of the state Supreme Court, rather than the foregoing intermediate court decisions. We disagree. In *Laiwa,* the court cited *Smith* for the proposition that the booking search exception to the Fourth Amendment will not support a belated search conducted after the booking process has ended. (*People v. Laiwa, supra,* 34 Cal.3d at p. 727.) However, while *Smith* may have involved a subsequent *search* of the inmate's property, the present matter does not. Here, there was no search of the property held in police storage. Detective Woodward merely opened the plastic bag to retrieve the rings which he already knew to be contained therein. In this sense, the present matter is analogous to the seizure of items observed in plain view. Whether he could see them or not, Detective Woodward knew the rings were in the plastic bag when he opened it and retrieved them. Thus, assuming *Smith* was properly decided, it is readily distinguishable. On the facts presented in this matter, there was no Fourth Amendment violation.

II-IX*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Morrison, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 14, 2001.

---

*See footnote, *ante,* page 390.