713 A.2d 364

John M. HOLLAND,

v.

STATE of Maryland.

No. 1946, Sept. Term, 1997.

Court of Special Appeals of Maryland.

July 15, 1998.

534

Margaret L. Lanier, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and M. Kenneth Long, Jr., State's Atty. for Washington County, Hagerstown, on the brief), for appellee.

Argued before MOYLAN and KENNEY, JJ., and JOHN J. BISHOP, Jr., Judge (retired) Specially Assigned.

MOYLAN, Judge.

The appellant, John M. Holland, was convicted by a Washington County jury, presided over by Judge Frederick C. Wright, III, of conspiracy to distribute cocaine. On this appeal, he raises the three contentions

1) that Judge W. Kennedy Boone, III, at a pretrial suppression hearing, erroneously failed to suppress a motel key taken from the appellant's belongings while the appellant was in custody at the Washington County Detention Center;

2) that Judge Wright erroneously admitted two separate items of hearsay evidence; and

3) that Judge Wright imposed an illegal sentence.

### Edwards v. United States

### and a Delayed Search–Incident

The cocaine-selling enterprise that was the *raison d'etre* of the conspiracy in this case operated from Room 136 of the Venice Motel on the outskirts of Hagerstown. A key to Room 136, which was found among the appellant's belongings shortly after his arrest, was one of many bits of evidence linking the appellant to Room 136. It was that motel key that was the subject of the challenged suppression ruling.

The appellant was arrested in downtown Hagerstown at approximately 10 P.M. on July 16, 1997. There is no issue before us challenging the propriety of that arrest. By approximately 10:45 P.M., the appellant had been booked in at the Washington County Detention Center. Some of his property (not more particularly described) was taken from him and kept in safekeeping in some sort of property room or storage locker. The appellant had been arrested along with two other co-conspirators. It was while interviewing one of those conspirators, several hours after the initial arrest and the booking, that the police learned that one of the other two (including the appellant) had been in the possession of a key to Room

136. The police then discovered the key as part of the property that had been taken from the appellant.

■ The appellant claims that the warrantless search of his property was an unreasonable search and seizure within the contemplation of the Fourth Amendment. Were this issue before us as of first impression, we would not hesitate to announce that there was nothing improper about that warrantless search. It is not necessary for us to be so bold, however, for we find that the situation is completely controlled by *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

The appellant himself cites and quotes from *Edwards* but, significantly, only from the dissenting opinion of Justice Stewart. We are controlled, of course, by the majority opinion, which reached a result diametrically contrary to that urged by Justice Stewart's dissent.

■ The *Edwards* case, of course, is what it is. If it is deemed desirable for purposes of academic clarity, however, to locate the *Edwards* situation within one of the more familiar and firmly rooted exceptions to the warrant requirement, it would not be inappropriate to think of *Edwards* as a variation on the theme of search incident to lawful arrest. Following a lawful arrest, without anything more needing to be shown, the police are routinely entitled to seize and to search all property within the arrestee's reach, lunge, or grasp. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The search incident may be, and usually is, conducted at the time and place of the initial arrest itself, the standard or typical situation. At the option of the police, however, it may be deferred until the arrestee has arrived at the jailhouse and is being booked or, indeed, might be deferred to some later time. In this regard, the *Edwards* opinion, 415 U.S. at 802–03, 94 S.Ct. 1234, was very clear:

> The prevailing rule under the Fourth Amendment that searches and seizures may not be made without a warrant is subject to various exceptions. *One of them permits warrantless searches incident to custodial arrest* and has tradi-

tionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained.

*It is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention.*

(Citations omitted; emphasis supplied).

In the *Edwards* case itself, Edwards was arrested on the street at 11 P.M. He was taken to the local jail and placed in a cell. Subsequent investigation at the scene of the suspected burglary suggested to the police that inculpatory paint chips might well be found on the clothing of the burglar. It was the next morning, eight or nine hours after the initial arrest, that Edwards's clothing was warrantlessly seized from him and then examined. Edwards sought to suppress that warrantless seizure and subsequent examination of his clothing as unreasonable. The United States Court of Appeals for the Sixth Circuit agreed with Edwards and reversed his conviction.[1] The Supreme Court, in turn, reversed the Sixth Circuit.

The *Edwards* opinion, 415 U.S. at 803, 94 S.Ct. 1234, cited to *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), wherein the Supreme Court had held that it was immaterial whether the defendant's property was immediately seized and searched at the time of his initial arrest at his hotel or thereafter at the place of detention. The *Edwards* Court went on:

The courts of appeals have followed this same rule, holding that *both the person and the property in his immediate possession may be searched at the station house after the*

---

**1.** The Circuit Court disagreed with two other circuits, the Second and the Fifth, which had held to the contrary. The Sixth Circuit, as the appellant urges here, had held that notwithstanding a lawful arrest and probable cause to believe that paint chips would be found, no further warrantless activity is permitted "after the administrative process and the mechanics of the arrest have come to a halt." 474 F.2d 1206, 1211 (6th Cir.1973).

*arrest has occurred at another place* and if evidence of crime is discovered, it may be seized and admitted in evidence. *Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis* or that the test results are admissible at trial.

415 U.S. at 803–04, 94 S.Ct. 1234 (Footnotes omitted; emphasis supplied).

The Supreme Court went on to explain that a delayed "search incident" does not intrude any more on a protected right than a more immediate "search incident" would have done:

This was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention. The police did no more on June 1 than they were entitled to do incident to the usual custodial arrest and incarceration.

415 U.S. at 805, 94 S.Ct. 1234.

It was clear, moreover, that the property subjected to the delayed search was already in the lawful custody of the police and, therefore, not immune from examination by them:

It must be remembered that on both May 31 and June 1 the police had lawful custody of Edwards and necessarily of the clothing he wore. *When it became apparent that the articles of clothing were evidence of the crime for which Edwards was being held, the police were entitled to take, examine, and preserve them for use as evidence,* just as they are normally permitted to seize evidence of crime when it is lawfully encountered.

415 U.S. at 806, 94 S.Ct. 1234 (Emphasis supplied).

A word is in order about the precise timing of the exigencies that historically has justified the phenomenon of a warrantless search incident to lawful arrest. The twin exigencies that gave rise to the exception were thoroughly analyzed in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685

(1969), and need not be rehearsed here. Our concern is not with **what** the exigency is but with **when** the exigency is.

When the police, on the street or at the station house, lawfully take an arrestee into custody, the twin exigencies of that custodial situation (concerning *possible* weapons and *possible* evidence) justify the warrantless search-incident at its inception. Once the automatic police prerogative of conducting a warrantless search-incident vests, however, it is not necessarily divested just because it is not immediately utilized. The reasonableness clause of the Fourth Amendment does not hold a stop-watch on the police, commanding that as exigency arguably diminishes, the search-incident prerogative proportionately lapses.

A delay in the execution of a search-incident, moreover, does not necessarily mean that the exigencies have been diminished. In the station house just as in the alley, there is a danger that an arrestee about to be placed in custody has on his person or in his attendant property 1) a possible weapon or 2) possible evidence of some crime possibly capable of being destroyed or hidden. A delayed or even a follow-up search-incident (a more thorough or follow-up search-incident is not unreasonable) is frequently part of the booking procedure.

When the property is taken from the arrestee, the Fourth Amendment intrusion is a *fait accompli*. When, hours later, a crime lab technician picks up a gun from a storage locker to check it out ballistically, that is not a fresh Fourth Amendment intrusion requiring either a fresh exigency or a warrant for its justification. The danger of destruction is at an end once an arrestee's property has been seized. That is the seizure, and the only seizure, that has Fourth Amendment significance. The property may then be dusted for fingerprints, examined for bloodstains or DNA, checked for serial numbers, or otherwise processed on a more leisurely basis as an investigation unfolds. Every time that an item, already in police hands, is physically picked up and examined or reexamined, that is not a fresh Fourth Amendment intrusion requiring a fresh justification.

Once given the predicate fact of a lawful arrest, moreover, there is no incremental probable cause requirement for what is searched for and seized as an incident of that arrest. Just because the property seized, particularly in an institutional custodial setting such as in this case, is presumptively innocuous does not immunize it from subsequent examination and processing. An arrestee has no reasonable expectation that the police will not scrutinize closely those items' that are in their legitimate custody, discovering evidence, perhaps, even where none was initially suspected.

Our conclusion in this case is exactly what the Supreme Court's conclusion was in that case:

> Indeed, *it is difficult to perceive what is unreasonable about the police examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest.*

*United States v. Edwards,* 415 U.S. 800, 806, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974)(Emphasis supplied).

The appellant here protests that the property in question was being held for him in safekeeping after it had already been inventoried. The Supreme Court, in *Edwards,* made precise reference to a delayed warrantless search of inventoried property:

> In *Cooper v. California,* [386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967)] an accused had been arrested for a narcotics offense and his automobile impounded preparatory to institution of forfeiture proceedings. The car was searched a week later without a warrant and evidence seized that was later introduced at the defendant's criminal trial. . . . It was no answer to say that the police could have obtained a search warrant, for the Court held the test to be, not whether it was reasonable to procure a search warrant, but whether the search itself was reasonable, which it was.

415 U.S. at 806–07, 94 S.Ct. 1234.

The *Edwards* Court, 415 U.S. at 807, 94 S.Ct. 1234, quoted with approval from *United States v. Caruso,* 358 F.2d 184, 185 (2nd Cir.1966), wherein a defendant's clothing had been taken

from him and examined six hours after his arrival at the place of detention:

He and his clothes were constantly in custody from the moment of his arrest, and the inspection of his clothes and the holding of them for use in evidence were, under the circumstances, reasonable and proper.

The Supreme Court's Fourth Amendment conclusion in *Edwards* was on all fours with the situation now under review:

*Caruso* is typical of most cases in the courts of appeals that have long since concluded that *once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the other hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the "property room" of the jail, and at a later time searched and taken for use at the subsequent criminal trial.*

415 U.S. at 807, 94 S.Ct. 1234 (Footnote omitted; emphasis supplied).

We hold that the key to Room 136 of the Venice Motel was properly not suppressed.

## "There They Are":

### *A Bit of Verbal Trivia*

Corporal Robert Leatherman testified that after the execution of a search warrant on Room 136 of the Venice Motel, he was transporting Teresa Russ and Brenda Tennie, two teen-aged females who had been arrested in Room 136, from the motel to the police station. En route, one of the two young women spotted both the appellant and a codefendant on the street and suddenly blurted out, "There they are." After clarifying that the antecedent of the pronoun "they" was two

men who had earlier been in Room 136 of the Venice, the officer drove around the block, cut through an alley, and arrested the two. The appellant now objects to the introduction into evidence of the words "There they are" as inadmissible hearsay.

■ Even if, *arguendo*, the admission of the evidence were error, it was demonstrably harmless beyond a reasonable doubt. The night manager of the Venice Motel had already connected the appellant with Room 136 and with the suspicious activity that had occurred there on the previous night. Deputy Daniel Henley of the Narcotics Task Force had conducted a surveillance of Room 136 and observed the appellant leave the room. Following his arrest, the appellant had in his possession a key to Room 136. Teresa Russ, moreover, testified at great length about the appellant's involvement with Room 136 and the drug activity that was emanating from it. The additional passing identification of the appellant merely as someone who had been in Room 136 was cumulatively redundant and harmless beyond a reasonable doubt.

■ That, however, is a "backstop" position. Our holding is that there was no error. In the first place, the recounting of the brief utterance simply provided some narrative background as to why Corporal Leatherman· drove around the block and arrested the appellant when he did. In that capacity, the verbal event was significant not for the truth of the thing asserted but only for the effect it had on Corporal Leatherman and was, therefore, non-hearsay.

■ If, however, the words were somehow deemed to be hearsay, we still would have no difficulty in legitimating their admission as an exception to the Rule against Hearsay. Even if offered for the truth of the thing asserted, the words would presumptively qualify under Md. Rule 5–802.1(c):

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule. . . .

(c) *A statement that is one of identification of a person made after perceiving the person . . .*

(Emphasis supplied).

 The appellant, however, points out that only one of the two women in the car, Teresa Russ, had testified at the trial and was subject to cross-examination. He argues that it is possible that the other woman, Brenda Tennie, had uttered the words and that, because of her non-availability, Rule 5–802.1(c) would not apply to an identification made by her.

In that eventuality, we would go on to find that the utterance was nonetheless a legitimate hearsay exception under Rule 5–803(b)(1) as a present sense impression. *See Booth v. State,* 306 Md. 313, 508 A.2d 976 (1986).

### "We're Going Down the Strip to Sell":

#### *What Purpose Did That Evidence Serve?*

The appellant's second subcontention based on an ostensible violation of the Rule against Hearsay gets down to the fundamental nature of the entire hearsay phenomenon. When a witness testifies as to words spoken by some other person on some other occasion, it has become, sadly, a Pavlovian reflex among lawyers to leap to their feet and yell, "Hearsay!" The reflex is frequently as nonsensical as it is automatic. Just as a witness may testify as to what the witness has seen, has smelled, has tasted, or has felt (as a tactile sensation), the witness may also testify as to what he has heard. The only limitation on the recounting of that last sensory perception would be if 1) the sounds heard were words spoken by another and 2) the words, if recounted in court, would constitute inadmissible hearsay evidence.

To qualify as hearsay, the words recounted in court must, for starters, constitute an assertion or statement of a fact. Many out-of-court utterances are self-evidently not assertions. If a witness testifies to the out-of-court inquiry, "What time is it?," that inquiry is obviously not an assertion of anything. For an out-of-court utterance to qualify as an assertion, it generally must be in the indicative or declarative mood, rather

than in the interrogative mood, the imperative mood, or the subjunctive mood. An out-of-court assertion of a fact may be true or untrue. For that reason, its admissibility in evidence is problematic if offered to prove that fact. An out-of-court inquiry, "What time is it?" can be, by its very nature, neither true nor untrue and there is, therefore, no such credibility problem. The out-of-court command, "Stop!" can be, by its very nature, neither true nor untrue and there is, therefore, no such credibility problem.

Even an out-of-court utterance that is an assertion of a fact, however, does not necessarily qualify as hearsay evidence. It is further required that the out-of-court assertion be offered for the truth of the thing asserted. Only that raises the question of the credibility of the out-of-court asserter and, therefore, engages the gears of the Rule Against Hearsay and its multitudinous exceptions.

Is Whitaker Chambers's out-of-court assertion, "Alger Hiss is a Communist" hearsay or non-hearsay? Obviously, we do not know until we know the purpose for which it is offered. If offered at Hiss's trial for treason to prove that Hiss is a Communist, it is offered for the truth of the thing asserted and is, therefore, hearsay. If offered, on the other hand, at Chambers's trial for slander, it is offered not for the truth of the thing asserted but, ironically, for the untruth of the thing asserted and is, therefore, non-hearsay. Is an accident victim's out-of-court assertion, "The light was red when the defendant ran through it and hit me" hearsay or non-hearsay? Obviously, we do not know until we know the purpose for which it is offered. If offered on the issue of liability to prove that the light was red, it is offered for the truth of the thing asserted and is, therefore, hearsay. If offered, on the other hand, on the issue of whether the statute of limitations had run on the filing of the wrongful death action, it is offered to prove only that the victim was still alive at the time she made the out-of-court assertion. The truth or falsity of the assertion itself is immaterial and the assertion is, therefore, non-hearsay.

During her direct examination, Teresa Russ described the group of persons who were in Room 136 of the Venice Motel, one of whom was the appellant. The "strip" was the Jonathan Street area in Hagerstown, an area notorious for heavy drug trafficking. Teresa Russ's testimony was that either the appellant or one of his companions announced, "We're going down the strip to sell." After her recollection was refreshed by reference to her prior written statement, she remembered that, because of heightened caution generated by the arrest just hours before one of their close associates on the strip, the statement she heard with respect to selling on the strip might actually have been, "We wasn't going out until tonight."

It does not matter which of the two partially contradictory statements as to intent—"We are going" or "We are not going until later"—is an issue. For the sake of convenience, we will deal, for discussion purposes, with the statement, "We're going down the strip to sell." The appellant objects that that out-of-court utterance, perhaps from the mouth of the appellant but perhaps from the mouth of one of his co-conspirators, does not fit within any of the firmly rooted exceptions to the Rule Against Hearsay. The appellant neglects, however, to touch first base by way of showing that the statement was hearsay in the first instance, so as even to require qualification under one of the firmly rooted exceptions.

█ If the appellant announced to others in Room 136 of the Venice Motel, "We're going down the strip to sell," we are indifferent to whether that statement of intent was the truth or was a lie. The fact that he said the words is all that matters. Even if a statement of intent is taken to be an assertion, the evidentiary value of the utterance did not depend on the truth of the thing asserted. It did not even matter whether it was the appellant or one of the others in Room 136 who actually uttered the words.

The appellant was not convicted of selling cocaine on the strip or anywhere else. He was convicted for having conspired with other persons in Room 136 to distribute cocaine. To prove the conspiratorial *mens rea*, it is necessary to prove

that two or more of the conspirators were singing from the same page—that they were operating collectively and not individually. Strong evidence of such a meeting of the minds is the conversation among the conspirators.

The words were offered as circumstantial evidence that either the appellant or the other codefendant who uttered them along with others who heard the words were privy to a concerted plan to sell narcotics—on the strip or elsewhere, immediately or after the coast was clear. The very uttering of the words helped to show the state of mind of the one who uttered them and/or of others who heard them. As circumstantial evidence used to prove that collective state of mind, to wit, the conspiracy, the words were non-hearsay. *See* L. McLain, *Maryland Evidence,* § 801.10:

> *Statements offered,* not to prove the truth of the matters asserted therein, but *as circumstantial evidence that the declarant had knowledge of* or believed *certain facts or had a particular state of mind,* when that knowledge, belief, or state of mind is relevant, *are nonhearsay.*

(Footnotes omitted; emphasis supplied). In discussing types of utterances which are non-hearsay, *McCormick on Evidence* (3d ed.1984), § 250 at 741 observes:

> An extension of this analysis is applicable to declarations evincing knowledge, notice, or awareness of some fact. *Proof that one talks about a matter demonstrates on its face that he was conscious or aware of it, and veracity does not enter into the situation.*

(Emphasis supplied).

## Discretion Consistently

### Exercised the Same Way Is Still Discretion

■ The appellant complains finally that Judge Wright imposed an illegal sentence because he failed to exercise discretion. We do not agree. In imposing sentence, Judge Wright observed:

> On the charge of conspiracy to distribute cocaine it will be the judgment of this Court that John Holland be confined to

the custody of the Division of Correction for a period of fifteen years. And it will begin at the time of his arrest to be credited for the time that he has spent in jail awaiting trial.

There is no doubt in my mind that Mr. Holland participated in the bringing of and the source of substantial amounts of this killer drug, crack cocaine, into our community. And *anybody who does that is going to get very strict sentences by this Court.*

(Emphasis supplied).

We see nothing improper in either the sentence or that statement by Judge Wright. The sentence was within the legislative limit. There is no evidence that it was motivated by personal hatred, malice, or ill-will. It was based on the evidence developed in this case. The fact that a judge, even as a general rule, has a policy of imposing stiff sentences on those who bring a "killer drug" into his community is not a failure to exercise discretion. It is, rather, one of the myriad ways in which discretion may be exercised.

That a veteran and experienced judge does not approach each sentencing exercise as if it were some new judicial experience of first impression does not mean that that judge has thereby failed to exercise discretion. That a veteran and experienced judge develops over the years a consistently applied and deeply ingrained sentencing philosophy does not mean that that judge has thereby failed to exercise discretion. That an experienced and veteran judge may fall into predictable and identifiable sentencing habits and patterns does not mean that that judge has thereby failed to exercise discretion.

The appellant relies on the dubiously shaky authority of *Dennison v. State,* 87 Md.App. 749, 591 A.2d 568 (1991). That was a "hard case" that probably should be confined to its own facts.[2] Even granting it some persuasive weight, the circum-

---

2. Professor Max Radin has explained that when an appellate court "confines to its own facts" one of its earlier decisions, that may be the

stances of that case do not in any event resemble those in this case. In *Dennison,* the sentencing judge indicated that whenever a death resulted, he invariably imposed the maximum sentence. Such impolitic candor can always be dangerous.[3] Under those circumstances, we concluded that there had been no exercise of discretion.

In *Dennison,* we held that a judge who, albeit conscious of his power to do otherwise, always exercises his discretion the same way in certain situations and, perhaps more significantly, candidly acknowledges that he does so is, in fact, erroneously failing to exercise any discretion at all. What *Dennison* may realistically represent is one of those periodic and *ad hoc* lapses of appellate discipline as a reviewing court strained to vacate a sentence it strongly disapproved of but, had it exercised more rigorous appellate self-control, could have done nothing about. Even Homer nods. In any event, the *Dennison* holding is of such borderline legitimacy that we expressly disapprove its being cited to us as the standard for appellate review of sentencing discretion.

The fact that Judge Wright in this case exercised his discretion to be tough on drug dealers was not a failure to exercise discretion. It was a way to exercise discretion. Even an indication that he regularly imposed harsh sentences on drug dealers would not have indicated that he had failed to exercise discretion. It would have meant only that he consistently exercised his discretion the same way in an attempt to shield his community from potential future drug dealers.

Ironically, it is precisely when a judge's harsh sentencing policy as to certain types of crime is well known in advance of

way the appellate court has of "administering euthanasia to its own non-viable progeny."

3. It is an interesting philosophical question whether the range of discretion available to a sentencing judge includes the option to adhere to an habitual sentencing pattern, just so long as the judge is conscious of the fact that he has the power to depart should he choose to do so. When the only limit on the exercise of a judge's discretion is consciously self-imposed, is not that forbearance to depart from form *ipso facto* an inherent aspect of the available discretion?

the crime's even being committed that the sentencing threat can best serve its deterrent purpose. "Let the word go forth. Drug dealers are on notice to stay out of this town!" Deterrence, of course, has always been a fundamental purpose for the very existence of the criminal law. A judge's sentencing policy, within legislatively prescribed limits, that enhances the criminal law's deterrent force is not lightly to be condemned as an abuse of discretion. There was no abuse of discretion in this case.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.*