816 A.2d 883

**Thomas Clifford WALLACE**

v.

**STATE of Maryland.**

No. 57, Sept. Term, 2002.

Court of Appeals of Maryland.

Feb. 13, 2003.

70

Peter F. Rose, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Gary E. Bair, Solicitor General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, J.

Thomas Clifford Wallace, petitioner, seeks review of a judgment of the Maryland Court of Special Appeals affirming a trial judge's dismissal of petitioner's motion to suppress evidence as the fruit of an alleged illegal seizure. Judge John H. McDowell of the Washington County Circuit Court held a suppression hearing on August 24, 2000.[1] Judge McDowell

---

1. The suppression hearing dealt with several issues, including the admissibility of petitioner's clothing, the only issue in the case *sub*

denied the motion to suppress on all grounds on September 15, 2000, and, in reference to the issue in this case, he found that petitioner had no expectation of privacy in the seized clothing.[2]

On November 27–30, 2000, petitioner was tried and convicted by a jury in the Circuit Court for Washington County on charges of first and second degree murder, first degree assault and the unlawful taking of a motor vehicle. On March 8, 2001, Judge McDowell sentenced petitioner to life imprisonment without the possibility of parole on the first degree murder conviction[3] and to a concurrent five-year term of imprisonment for the unlawful taking of a motor vehicle conviction.

Petitioner filed a timely appeal to the Court of Special Appeals. On May 9, 2002, the Court of Special Appeals affirmed the trial court's rulings and issued an unpublished opinion. In that opinion, the intermediate appellate court upheld the trial court's denial of petitioner's motion to suppress holding that petitioner had no reasonable expectation of privacy in the property stored in the police property room, relying on the reasoning in *Holland v. State,* 122 Md.App. 532, 713 A.2d 364, *cert. denied,* 351 Md. 662, 719 A.2d 1262 (1998), and, in the alternative, that the property would have inevitably been discovered pursuant to a facially valid warrant. That court also ruled in favor of the State on other issues not before this Court when it affirmed the trial court in its denial of petitioner's motion to suppress petitioner's statements, his

---

judice, as well as the admissibility of the photo array identification, petitioner's statements made during booking procedures and other statements made by petitioner claimed to be in violation of his *Miranda* rights.

2. While the trial court and the Court of Special Appeals alternately relied on the doctrine of inevitable discovery in their decisions, there is no need for this Court, in light of our holding, to address that issue.

3. For sentencing purposes, Judge McDowell merged petitioner's sentences for the second degree murder and first degree assault convictions into this sentence for petitioner's first degree murder conviction.

motion to suppress photographic array identifications, his contention that DNA evidence should not be admitted, his motion to dismiss for speedy trial violations and his claim that the evidence was insufficient to support the convictions. Petitioner then filed a timely Petition for Writ of Certiorari to this Court.

On August 22, 2002, this Court granted petitioner's Petition for Writ of Certiorari involving the sole issue of petitioner's motion to suppress evidence stemming from an alleged illegal seizure of his clothing which was stored in a police property room pursuant to petitioner's arrest on an unrelated drug charge. *Wallace v. State*, 370 Md. 268, 805 A.2d 265 (2002). Petitioner presents one question for our review:

> "Whether the Court of Special Appeals' decision in *Holland v. State*, [122 Md.App. 532, 713 A.2d 364,] permitting warrantless searches and seizures incident to arrest to occur later upon arrival at the jail, applies to a seizure of clothing from the jail pursuant to an unrelated investigation ten days after an arrest on an unrelated charge." [Alteration added.] [Footnote omitted.]

The essence of petitioner's question is not limited to the applicability of *Holland v. State*; petitioner is essentially asking this Court to determine if the trial judge's denial, and the Court of Special Appeals' subsequent affirmation of that denial, of petitioner's motion to suppress evidence stemming from the alleged improper seizure of his clothing were correct. We hold that this evidence was admissible and thus affirm the Court of Special Appeals' holding that petitioner had no reasonable expectation of privacy in clothing legally obtained by law enforcement officials, stored in the jail's property room, moved to another area in the facility by an officer for safekeeping and later returned to the booking area of the jail facility and searched. The stains on clothing were analyzed after the execution of a valid search warrant.

## I. Facts

Petitioner's charges stem from the homicide of Darrius Fetterhoff, who was found alive, floating in Conococheague

Creek on August 25, 1997, after being missing since August 20, 1997. On August 28, 1997, three days after being found, Mr. Fetterhoff died.[4]

On August 20, 1997, the same day Mr. Fetterhoff disappeared and several days prior to the discovery of Mr. Fetter-

---

4. Petitioner's brief contains additional facts concerning the circumstances relating to petitioner's involvement in the homicide of Mr. Fetterhoff, including witness accounts and the like. They include the fact that Mr. Fetterhoff drove a light gray/silver Ford Tempo. Mr. Fetterhoff's wife, Lois Fetterhoff, testified that the car found by police, near the area where Mr. Fetterhoff was found floating, was her husband's car. She testified that the car had no prior blood stains in it and that her husband had his glasses and watch with him at the time he became missing.

Keisha Russ, a friend of petitioner, testified that petitioner and Clara Miller were attempting to obtain crack cocaine on August 20, 1997. Ms. Miller was driving a gold car with a Pennsylvania license plate, petitioner was in the passenger seat and Mr. Fetterhoff, who Ms. Russ also knew, was in the backseat. Ms. Russ later saw a shirtless petitioner and Ms. Miller at an apartment and petitioner had a bloody rag wrapped around his hand.

Sergeant Tom Newton of the Washington County Patrol Division testified that he found an abandoned vehicle, a light gray Ford Tempo, on August 21,1997. He had seen the same car on the morning of August 20, 1997, and observed a white male in his forties or fifties enter and exit the car. The driver of the car was a black male and the passenger was a female.

Kim Stottlemeyer testified that, while driving, she was stopped by a black male who asked if he could syphon some gasoline. She described the man as wearing a white tee shirt with red stains and that his car was white and contained a female passenger. She later identified petitioner as this man. Robert Kursey testified that, while driving on the same road as Ms. Stottlemeyer, he saw a car in the middle of the road with a black male talking to its driver. The man then approached Mr. Kursey's tow truck and asked for a ride. Mr. Kursey stated that the man had a bloody white tee shirt wrapped around his hand. Mr. Kursey gave the man and a female a ride into town. He later identified the man as petitioner. Corporal Roy Harsh interviewed Ms. Stottlemeyer and Mr. Kursey in connection with this incident and both witnesses identified the petitioner from a photo array.

Ultimately, DNA analysis of the blood stains on defendant's clothing established that the blood belonged to the victim.

As petitioner is only asking us to address the trial court's denial of his motion to suppress, we consider only those relevant facts brought out during the August 24, 2000 suppression hearing and view them in the light most favorable to the State. *See State v. Collins*, 367 Md. 700, 706–07, 790 A.2d 660, 663–64 (2002); *Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22, 22 (1990).

hoff floating in the creek, petitioner was arrested for an unrelated drug offense and was held at the Washington County Detention Center (WCDC). After petitioner was incarcerated on this charge, his personal belongings, including his clothing, were taken from him, inventoried and then stored in the WCDC property room. At the hearing on petitioner's motion to suppress the use, at trial, of this clothing and any evidence derived from it, Corporal Douglass Moore, the supervisor of intake and release of detainees at WCDC, testified regarding the taking and storing of detainees' personal property at WCDC. While not specifically recalling petitioner's intake on August 20, 1997, Corporal Moore described the "fairly standardized procedure" of seizing detainees' property during the intake process at WCDC. The relevant portions of the jail's policy manual were also admitted into evidence. He stated that, according to WCDC's policy manual, "All property is handled by all officers the same way." Detainees' small personal belongings are taken immediately, inventoried, sealed in a bag and placed in the property room. Before the prisoners are moved into the general population, their clothes are removed, placed by the prisoner into a labeled bag and stored in the property room by the detention center's staff. Each prisoner is issued a jump suit. Only uniformed personnel have access to the stored property; inmates do not have access to their belongings, including their clothing, once the inmates are moved into the general population. Corporal Moore also testified that there was no evidence that petitioner's intake was any different than that of the standard intake he described.

Inmates, however, may release their property to another individual, *e.g.,* a family member, etc., by filling out a "request slip" and having the property officer make arrangements for a clothing exchange. Most exchanges of clothing between inmates and visitors occur on weekends, but, generally, only when a request is properly submitted. Petitioner did not fill out a request to exchange clothing from August 30, 1997 to September 2, 1997, the time period in which the alleged Fourth Amendment violation took place.

Corporal Roy Harsh, the investigating officer in the Fetterhoff murder, received the accounts of the witnesses who had seen Mr. Fetterhoff's vehicle. Those witnesses gave a description of the victim and two others, a woman and a man associated with that vehicle.[5] The man's appearance was similar to that of petitioner. During a conversation with a sergeant in the drug task force that arrested petitioner on August 20, 1997, Corporal Harsh recited the description of the suspect male in the homicide to the sergeant. After hearing the suspect's description, the sergeant gave petitioner's name to Corporal Harsh.[6] Corporal Harsh then assembled a photo array including petitioner's picture and at least two witnesses identified petitioner as the suspect who had been seen in connection with the car.

After petitioner potentially was linked to the crime by the witnesses, Corporal Harsh went to WCDC in order "to verify what clothing items [petitioner] was wearing when he had been arrested on the 20th." Corporal Harsh first reviewed the inventory sheet record of petitioner's items in the property room and found descriptions of items similar to those furnished by the witnesses, including a pair of dark blue shorts. Realizing the evidentiary potential of petitioner's clothing, Corporal Harsh received permission from a jail side deputy, Deputy Russell, to move the clothing to the patrol side property room. Corporal Harsh stated that he moved the property "to the patrol side for safekeeping, due to the fact that it was a weekend and that the inmates generally receive visitors on the weekend and that they are allowed to release their personal items during visitation." Corporal Harsh removed a black tee shirt, dark blue shorts and a plastic bag with personal items because of their possible evidentiary value. Once on the patrol side, he separated the clothing from the plastic bag and, while folding the clothing, noticed stains on petitioner's shorts.

---

5. *See, supra,* note 4.

6. The actual name given to Corporal Harsh was not Thomas Clifford Wallace, but James Thomas, as petitioner was using that alias when he was arrested for the unrelated drug offense.

No analysis was done on the stains at that time; the items were placed in bags, recorded on the patrol side property record and placed in the secure property room of the patrol area. Other than putting the items in separate bags, petitioner's belongings remained in the same condition as they were before their transfer to the patrol side property room.

Corporal Harsh spoke to an attorney at the State's Attorney's Office on the following Tuesday morning, September 2, 1997, the day after the Labor Day holiday, in order to inform that office of the events regarding the investigation of petitioner's clothing and to receive advice on future actions. Corporal Harsh testified that he "was advised to take the items back over to the booking area and to obtain a search warrant to obtain those items."[7] Later that day, Corporal Harsh returned the items to the booking area of the jail, applied for a search warrant, in which he included his August 30th observations upon moving the clothing to the patrol side property room, and presented the application to Judge R. Noel Spence, who issued the warrant. Corporal Harsh executed the warrant that evening and the items were released from the booking area for analysis the next day.

## II. Discussion

### A. Standard of Review

This Court has recently summarized the standard of review of motions to suppress in the case of *State v. Collins,* 367 Md. 700, 706–07, 790 A.2d 660, 663–64 (2002), when we said:

"Our review of a Circuit Court's denial of a motion to suppress evidence under the Fourth Amendment is limited, ordinarily, to information contained in the record of the suppression hearing and not the record of the trial. *See Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999); *In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691, 693 (1997); *Simpler v. State,* 318 Md. 311, 312, 568 A.2d 22, 22

---

7. From the language of the briefs we assume that the "booking area" and the "patrol area" are located in different areas of the same facility.

(1990); *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749, 755 (1987). When there is a denial of a motion to suppress, we are further limited to considering facts in the light most favorable to the State as the prevailing party on the motion. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *Simpler,* 318 Md. at 312, 568 A.2d at 22. In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to the weighing and determining first-level facts. *Lancaster v. State,* 86 Md. App. 74, 95, 585 A.2d 274, 284 (1991); *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356, 358 (1990). When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his findings are clearly erroneous. *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430, 435 (1992); *Riddick,* 319 Md. at 183, 571 A.2d at 1240. Even so, as to the ultimate conclusion of whether an action taken was proper, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Riddick v. State,* 319 Md. at 183, 571 A.2d at 1240; *Munafo v. State,* 105 Md.App. 662, 669, 660 A.2d 1068, 1071 (1995)."

In the case *sub judice,* petitioner does not present a question concerning whether the factual findings of the hearing judge were clearly erroneous. Accordingly, we need only address the purely legal issue of whether an officer's moving of an inmate's clothing, previously inventoried at the jail and legally held by the government, is in violation of petitioner's Fourth Amendment rights. We hold that such a seizure (or continuous seizure), under the facts of this case, does not violate the Fourth Amendment rights of petitioner as petitioner did not have any reasonable expectation of privacy in the clothing that was legally in police custody.

## B. Legitimate Expectation of Privacy

The Fourth Amendment of the United States Constitution guarantees protection for individuals' rights to be free

from unreasonable government searches and seizures. It states:

> "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

These Fourth Amendment protections are applicable to the State of Maryland through the Fourteenth Amendment of the United States Constitution. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *Owens v. State,* 322 Md. 616, 622, 589 A.2d 59, 61, *cert. denied,* 502 U.S. 973, 112 S.Ct. 452, 116 L.Ed.2d 470 (1991).

While the Fourth Amendment has many facets and intricacies, the case *sub judice* involves a rather narrow issue. The essential question is whether the Fourth Amendment prohibits an officer from moving an inmate's clothing, which was previously inventoried at the jail and legally held by the government, from the property room of the jail to another property room of the patrol division in the same facility, and inspect it without a warrant. As such, we primarily focus our background discussion of Fourth Amendment jurisprudence on legitimate expectations of privacy and inventory searches, the law essential to our decision in the case *sub judice.*

▮ The Fourth Amendment's protections extend only to those items and places in which the individual claiming the protection has a legitimate expectation of privacy.[8] *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226–27 (1979); *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967); *Owens,* 322 Md. at 625–26, 589 A.2d at 63. The United States Supreme Court has revisited its interpretation of an individual's "legitimate expectation of privacy" on several occasions. In *Rakas v.*

---

**8.** For the purposes of this opinion, we use the terms "legitimate expectation of privacy" and "reasonable expectation of privacy" interchangeably.

*Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court further developed this analysis by minimizing the distinction between substantive Fourth Amendment analysis and Fourth Amendment standing. The Supreme Court stated:

> "[T]his Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of [the] traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.
>
> "Analyzed in these terms, the question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect. We are under no illusion that by dispensing with the rubric of standing ... we have rendered any simpler the determination of whether the proponent of a motion to suppress is entitled to contest the legality of a search and seizure. But by frankly recognizing that this aspect of the analysis belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing, we think the decision of this issue will rest on sounder logical footing."

*Id.* at 140, 99 S.Ct. at 428–29, 58 L.Ed.2d at 399 (citations omitted) (alterations added) (footnote omitted).

In discussing a test for determinating the scope of a legitimate expectation of privacy, the Supreme Court went on to say:

> "[A] 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered.... Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

*Id.* at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12, 58 L.Ed.2d at 401–02 n. 12 (alterations added).

The Supreme Court has subsequently articulated the *Rakas* two-step analysis as follows:

> "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.,* one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"

*Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 472, 142 L.Ed.2d 373, 379 (1998) (quoting *Rakas,* 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12, 58 L.Ed.2d at 401–02 n. 12). *See also California v. Greenwood,* 486 U.S. 35, 39–40, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30, 36 (1988) (stating that "An expectation of privacy does not give rise to Fourth Amendment protection, however, unless society is prepared to accept that expectation as objectively reasonable"). In other words, if petitioner does not have a legitimate expectation of privacy in his clothing in police custody, then he has no Fourth Amendment protections as to those items.

In his arguments to this Court, petitioner focuses not on whether he had a legitimate or reasonable expectation of privacy in his clothing stored in WCDC's property room, but on whether "the seizure was conducted incident to the relevant lawful arrest or conducted pursuant to any relevant legitimate inventory." In the situation here present, however, an inventory search, or search incident to arrest,[9] is only relevant to whether the police were legally in possession of petitioner's clothing in the first instance. In this petition the

---

9. Searches incident to arrest were discussed by the United States Supreme Court in *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). The *Robinson* Court stated:

> "The authority to search the person incident to a lawful custodial arrest, while *based upon the need to disarm and to discover evidence,* does not depend on what a court may later decide was the probability

issue of the taking of possession of the items in the first instance is not presented. What is presented is the appropriateness of it being inspected ten days later. Here the action being challenged is not the original seizure or the original search, but merely a continual seizure of the clothing when it was moved by the State from the jail side property room, placed in the patrol side property room, inspected, and then returned to the jail side property room. In the present case the State merely moved the property legally in its possession from one place to another place in the same facility also under the control of the State.

■ Once the inventory search of an individual is completed and his clothing and other items are seized as a part of the

---

in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."

*Id.* at 235, 94 S.Ct. at 477, 38 L.Ed.2d at 440–41 (emphasis added). *See also Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960)(allowing a search of a suitcase that could have been made at the scene of the lawful administrative arrest to be made at a later time in the detention center).

In *Illinois v. Lafayette,* 462 U.S. 640, 646–47, 103 S.Ct. 2605, 2609–10, 77 L.Ed.2d 65, 71 (1983), the Supreme Court set out the justifications for the "well-defined" inventory search exception to the Fourth Amendment at station houses as being "entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. A range of governmental interests supports an inventory process." That Court went on to discuss justifications such as securing the prisoner's property, preventing prison employees from stealing property, silencing arrestee's false claims of theft, inhibiting the careless handling of property, protecting against the import of weapons into the facility and assisting in the ascertaining of the prisoner's identity. *Id. See also South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)(holding that an inventory search of a vehicle lawfully impounded by the police as valid and did not violate the Fourth Amendment).

legitimate practices of the intake facility, that individual's clothing and other possessions so seized from him are in the legal possession of the police and any evidence discovered during such a search is, generally, admissible at trial. *Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65. In this case, petitioner does not challenge the legality of the August 20th inventory search conducted pursuant to his arrest on the unrelated drug charge. Therefore, there is no doubt that his possessions, including the clothing in question here, as far as this case is concerned, were in the legal possession of the police.

An important Supreme Court decision in respect to the situation in this case is *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). In *Edwards*, Edwards was lawfully arrested and placed in a jail cell. The police investigation of the crime scene revealed the possibility that forensic evidence was on Edwards' clothing. Therefore, the next day, without a warrant, the police took Edwards' clothing and held it as evidence. An examination of the clothing revealed paint chips which linked Edwards to the crime. This evidence was received at trial over Edwards' objection. The Supreme Court held that the evidence was admissible. In comparing the delayed search with the initial one, the Court said:

> "With or without probable cause, the authorities were entitled at that point not only to search Edwards' clothing but also to take it from him and keep it in official custody.... The police were also entitled to take from Edwards any evidence of the crime in his immediate possession, including his clothing.... [T]he clothing he had been wearing at the time of arrest was taken from him and subjected to laboratory analysis. This was no more than taking from respondent the effects in his immediate possession that constituted evidence of crime. This was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention.

The police did no more on June 1 than they were entitled to do incident to the usual custodial arrest and incarceration." *Id.* at 804–05, 94 S.Ct. at 1237–38, 39 L.Ed.2d at 776–77 (alteration added) (footnote omitted). In discussing the reasonableness of the search, the Court went on to say:

"[T]he police had lawful custody of Edwards and necessarily of the clothing he wore. When it became apparent that the articles of clothing were evidence of the crime for which Edwards was being held, the police were entitled to take, examine, and preserve them for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered.... Indeed, it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as a result of a lawful arrest."

*Id.* at 806, 94 S.Ct. at 1238, 39 L.Ed.2d at 777 (alteration added).

This Court, while not interpreting *Edwards* in this particular context, has spoken to a similar and instructive issue in our decision of *Gee v. State*, 291 Md. 663, 435 A.2d 1387 (1981). In *Gee*, a police officer in the District of Columbia arrested Gee for robbery and, pursuant to a search incident to that arrest, legally took possession of a wallet containing a police badge, which the victims of the robbery said that Gee had flashed during the robbery. The wallet was placed in the possession of the property custodian of the Metropolitan Police Department. Two days later, a Prince George's County police officer, acting on a report of a similar robbery that occurred months prior,[10] went to the property custodian of the Metropolitan Police Department and examined Gee's wallet. He discovered evidence inside it, including the badge, which was introduced as evidence in Gee's Maryland trial. Gee filed a motion to suppress the evidence from this search, arguing that

10. The previous robbery victims gave a description of the robbers and the license plate number of the car used in the robbery, which led to Gee as a suspect.

no warrant was issued and there was no specific exception to the warrant requirement to justify the warrantless search by the Prince George's County police officer.

This Court held that the Prince George's County officer's inspection of Gee's wallet was valid as he did no more than what the District of Columbia officer had already done in the first search, which was to effectuate a valid search incident to arrest. *Id.* at 669–72, 435 A.2d at 1390–91. In *Gee,* we stated:

"The clear majority of United States Courts of Appeal have held there to be no constitutional violation under circumstances similar to those presented in the instant matter. Where New Jersey authorities had arrested the defendant for carrying a concealed weapon, the subsequent inspection by a federal agent of money taken from the defendant and held for safekeeping was determined not to require a warrant in *United States v. Jenkins,* 496 F.2d 57 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). This was so even though the subsequent inspection, which focused on the serial numbers of bills, revealed that it was 'bait money' taken in a bank robbery. The court said that '[n]o reasonable expectations of privacy were invaded and no search occurred when the police officers in this case simply looked again at what they had already—lawfully—seen.' *Id.* at 74. Where the entry by fire marshals onto premises which were the subject of a suspected arson was justified by exigent circumstances, the subsequent removal of physical evidence of arson by Delaware State Police, acting without a warrant, was valid since no greater invasion of privacy resulted. *Steigler v. Anderson,* 496 F.2d 793 (3d Cir.), *cert. denied,* 419 U.S. 1002, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974). In *United States v. Grill,* 484 F.2d 990 (5th Cir.1973), *cert. denied,* 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974), a federal agent who had no warrant went into the personal belongings of a federal prisoner being held awaiting trial in a county jail in Palm Beach, Florida in order to test whether a key taken from the arrestee would fit the lock on a bag of cocaine which had been seized in the Bahamas. In sustaining the

search, the court said that the underpinning of the cases which find no constitutional violation is that 'the items in question have been exposed to police view under unobjectionable circumstances, so that no reasonable expectation of privacy is breached by an officer's taking a second look at matter with respect to which expectation of privacy already has been at least partially dissipated.' *Id.* at 991. *Accord, United States v. Lewis,* 504 F.2d 92 (6th Cir.1974), *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975); *United States v. Gargotto,* 476 F.2d 1009, 1014 (6th Cir. 1973), *cert. denied,* 421 U.S. 987, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975) ('Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken.'): *Gullett v. United States,* 387 F.2d 307, 308 n. 1 (8th Cir.1967), *cert. denied,* 390 U.S. 1044, 88 S.Ct. 1645, 20 L.Ed.2d 307 (1968); *United States v. Romero,* 585 F.2d 391, 396 (9th Cir.1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979)(" "[E]xamination by another law enforcement agency is not a sufficiently distinct intrusion into the defendants' privacy to trigger the requirements of the Fourth Amendment." '); *Westover v. United States,* 394 F.2d 164, 165 (9th Cir.1968)('[A] search warrant to again look at the money already in police custody does not make sense.').

. . .

"The state cases seem to be in accord with the general federal rule. For example, in *State v. Gonzales,* 111 Ariz. 38, 523 P.2d 66 (1974), Glendale, Arizona police had arrested the defendant for public drunkenness. When he was booked at the jail, his clothing was taken from him. Several hours later the Glendale police were advised by the Sheriff's office of Maricopa County, Arizona, that the defendant was a suspect in a murder case in Phoenix. The clothing was impounded, subsequently taken by Maricopa authorities without a warrant and introduced by the state at the murder trial.... It was held there was no merit to the defendant's contention that the clothing had been illegally

seized when it was made available by the law enforcement officers of one subdivision to those of another. *See also State v. Williams,* 227 So.2d 331 (Fla.App.1969); *Capps v. State,* 505 S.W.2d 727 (Tenn.1974)."

*Id.* at 670–72, 435 A.2d at 1390–91 (some citations omitted).

In *Holland, supra,* the Court of Special Appeals interpreted the language in *Edwards* in a similar context as that of the case *sub judice.* As previously articulated, *Edwards* reasoned: "it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as a result of a lawful arrest." *Edwards,* 415 U.S. at 806, 94 S.Ct. at 1238, 39 L.Ed.2d at 777. The Court of Special Appeals referenced this language and reasoning to directly support its conclusion as follows:

"When the property is taken from the arrestee, the Fourth Amendment intrusion is a *fait accompli.* When, hours later, a crime lab technician picks up a gun from a storage locker to check it out ballistically, that is not a fresh Fourth Amendment intrusion requiring either a fresh exigency or a warrant for its justification. The danger of destruction is at an end once an arrestee's property has been seized. That is the seizure, and the only seizure, that has Fourth Amendment significance. The property may then be dusted for fingerprints, examined for bloodstains or DNA, checked for serial numbers, or otherwise processed on a more leisurely basis as an investigation unfolds. Every time that an item, already in police hands, is physically picked up and examined or reexamined, that is not a fresh Fourth Amendment intrusion requiring a fresh justification. "... Just because the property seized, particularly in an institutional custodial setting such as in this case, is presumptively innocuous does not immunize it from subsequent examination and processing. *An arrestee has no reasonable expectation that the police will not scrutinize closely those items that are in their legitimate custody, discovering evidence, perhaps, even where none was initially suspected.*"

*Holland,* 122 Md.App. at 539–40, 713 A.2d at 367–68 (emphasis added). In *Holland,* after Holland was arrested and incarcerated, the police took his property and stored it in a locker for safekeeping. After several hours, a co-conspirator informed the police that Holland was in possession of the hotel room key to a room that was the headquarters of a drug operation. The police then obtained the key from Holland's property stored in the jail pursuant to the inventory search. The Court of Special Appeals affirmed the denial of Holland's motion to suppress. While not specifically articulating its reasoning in terms of the Supreme Court's reasonable expectation of privacy test, what the *Holland* court did, and what we hold today, simply restates this sentiment in the framework of the expectation of privacy test.

Cases from other jurisdictions with analogous facts to the case at bar have similarly used the reasonable expectation of privacy analysis in upholding a denial of a defendant's motion to suppress. In *Williams v. Commonwealth,* 259 Va. 377, 527 S.E.2d 131 (2000), the defendant was arrested and processed for an unrelated charge and his possessions, including his clothing, were inventoried and stored in police custody. An officer received information that the defendant's boot matched that of a boot impression found at a murder scene. The detective working the murder case obtained the boot from the property room without a warrant. The boot, and evidence stemming from it, were used at trial to link the defendant to the murder. Relying on *Edwards,* the Virginia Supreme Court said:

> "We conclude that the defendant, Williams, had no expectation of privacy in his boots that society is prepared to recognize as reasonable. The boots were in the custody of the Richmond City Sheriff pursuant to administrative booking policies and procedures. We hold that when a person, such as the defendant, has been lawfully arrested and his property has been lawfully seized by law enforcement personnel pursuant to that arrest, the arrestee has no reasonable expectation of privacy in that property, and later

examination of the property by another law enforcement official does not violate the Fourth Amendment."

*Id.* at 386, 527 S.E.2d at 136. That Court also found no merit to the defendant's argument that *Edwards* was distinguishable because the clothing was being held for a charge other than the murder charge for which it was searched again. It said: "This distinction is legally insignificant because the dispositive inquiry remains whether the defendant, Williams, had an expectation of privacy in the seized items." *Id.* at 386 n. 2, 527 S.E.2d at 136 n. 2.

In *Oles v. State,* 993 S.W.2d 103 (Tex.Crim.App.1999), eight days after the defendant had been arrested on a motion to revoke probation, an investigator seeking evidence relating to another offense removed the defendant's clothing that had been inventoried and stored in police custody. Although no forensic evidence was apparent to the naked eye, the investigator brought the clothing to the medical examiner's office to have it checked for traces of blood. The victim's blood was discovered on the defendant's shoes, the evidence was admitted at trial and the defendant was ultimately convicted of murder. The court found, similar to the court in *Williams,* that the fact that the defendant was arrested and in detention for an offense other than the one for which the investigator was seeking evidence was of no consequence. In addition, that court discussed factors that are commonly applicable to whether an expectation of privacy is legitimate after it stated that several of those factors were inapplicable to this situation in that case, "largely because a jail cell and a storage facility operated by law enforcement are simply not places commonly associated with notions of privacy," because "the place 'invaded' is a storage area operated by the officers investigating the accused—who himself has no ability to enter the area even if he so wanted." *Id.* at 109. In discussing the relevant factors, that court stated:

"Some of the factors are applicable to this situation, however, such as whether the accused had complete dominion or control and the right to exclude others from his belongings, whether he took normal precautions customarily

taken by those seeking privacy, or whether his claim of privacy is consistent with historical notions of privacy. These factors all weigh against a finding of an expectation of privacy in the present case, but none as strikingly as the one involving historical notions of privacy. *No situation imaginable is as alien to the notion of privacy than an arrestee sitting in a jail cell, completely separated from his effects that are lawfully controlled and inventoried by the very police that are investigating him.*

"It is doubtful in these situations that any appellant would harbor a subjective belief that inventoried items are still private to him. Notwithstanding that improbability, based on the application of the factors described above, it is nearly certain that society would not recognize this belief as objectively reasonable in these situations. This inevitably leads to the conclusion that it is proper for police to examine and test clothing validly within their control and custody, regardless of the existence of probable cause or exigent circumstances."

*Id.* (citation omitted) (emphasis added) (footnote omitted). The court noted that the defendant could have shown a subjective expectation of privacy by asking a third person to pick up the items for him, but that it was not clear that this would be objectively reasonable. While the petitioner in the case *sub judice* may have had the opportunity of attempting to have his clothing picked up by a family member, he had not taken advantage of that opportunity at the time of Corporal Harsh's actions.

Several other cases, with slightly different factual situations from the case at bar, similarly hold that a detainee has no reasonable or legitimate expectation of privacy in effects being lawfully held by the police.[11] *See United States v. Jenkins,* 496 F.2d 57 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct.

---

11. These cases, while having a range of factual scenarios, generally involve "second look" cases where a law enforcement official effectuates a second look or search of a detainee's belongings that had been properly inventoried pursuant to a legal search and seizure.

1119, 43 L.Ed.2d 394 (1975) (permitting a federal agent's second look at items taken by state police pursuant to a valid arrest on state charges as the defendant could not reasonably expect a right to privacy in the serial numbers of his personal money stored in police custody); *United States v. Thompson,* 837 F.2d 673 (5th Cir.), *cert. denied,* 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988) (the defendant had no reasonable expectation of privacy with respect to property taken from him pursuant to a valid inventory search regardless of the fact that the defendant was arrested on state charges and the search took place several days after the arrest); *Ex parte Hilley,* 484 So.2d 485 (Ala.1985) (search of purse in property room nearly one month after the defendant was arrested on separate charges upheld because she had no reasonable expectation of privacy in the purse as it was in the continuous possession of the police.); *People v. Gunn,* 112 Cal.App.3d 970, 169 Cal.Rptr. 559 (1980) (citing *Edwards,* no expectation of privacy involved when the property was lawfully in the custody of the police even though the second search, occurring within 24 hours, was to obtain evidence for a different crime); *People v. Salaz,* 953 P.2d 1275, 1277 (Colo.1998) (holding, "In the absence of a reasonable expectation of privacy, law enforcement officials are free to conduct a warrantless search notwithstanding whether the search is also justified by exigent circumstances or some other exception to the warrant requirement," where the officers, in a second search hours after the inventory search, discovered that defendant had drugs hidden in property stored pursuant to an inventory search); *People v. Richards,* 94 Ill.2d 92, 67 Ill.Dec. 839, 445 N.E.2d 319 (1983) (permitting an officer to take a second look at evidence stored in police custody pursuant to a valid inventory search because under the circumstance where the evidence was in plain view of the police, the defendant had no reasonable expectation of privacy in those items that the police merely looked at again); *State v. Copridge,* 260 Kan. 19, 918 P.2d 1247 (1996) (no reasonable expectation of privacy in lawfully inventoried property where the defendant was arrested on unrelated charges and the inventoried property was searched again on the same

day as arrest); *State v. Costello,* 231 Kan. 337, 644 P.2d 447 (1982) (finding, as equivalent to the reasoning in a plain view case, that the defendant had no expectation of privacy in a ring that was validly inventoried two and a half months before the second look); *State v. Jellison,* 236 Mont. 300, 769 P.2d 711 (1989) (no expectation of privacy in property where the police have previously viewed that property under unobjectionable circumstances); *State v. Adams,* 132 N.J.Super. 256, 333 A.2d 304 (1975) (no invasion of defendant's reasonable expectation of privacy by an officer taking a second look at items readily visible in the property box one day after original arrest); *People v. Natal,* 75 N.Y.2d 379, 553 N.Y.S.2d 650, 553 N.E.2d 239, *cert. denied,* 498 U.S. 862, 111 S.Ct. 169, 112 L.Ed.2d 134 (1990) (no reasonable expectation of privacy in items being held pursuant to a valid inventory search when the district attorney seized the items nine months after the inventory search and one week before trial); *State v. Cheatam,* 112 Wash.App. 778, 51 P.3d 138 (2002) (citing *Edwards* and holding that the defendant had no expectation of privacy in his shoes stored in police custody when they were seized by on officer investigating the crime in which he was being held four days after he was booked); *Marquez v. State,* 754 P.2d 705 (Wyo.1988) (holding that the defendant had no reasonable expectation of privacy in boots held in the police storage room notwithstanding the fact that the sheriff's office seized the boots in order to conduct forensic experiments on them months after they were validly seized pursuant to an inventory search). *Cf. State v. Wheeler,* 128 N.H. 767, 519 A.2d 289 (1986) (although not relying on the Federal Constitution, upholding an officer's retention of evidence for the purpose of preserving it for a later forensic examination after a search warrant was procured for that examination); *State v. Betterley,* 191 Wis.2d 406, 529 N.W.2d 216 (1995) (no reasonable expectation of privacy in a ring being held pursuant to an inventory search on unrelated charges, but limiting the permissible extent of the subsequent examination to that permissible in the first seizure).

■ We hold in this case, similar to these out-of-state cases, and in line with the cases of *Edwards, Gee* and *Holland,* that once petitioner's belongings were taken and put into police custody, he had no reasonable expectation that they would be kept private from police inspection. Not only was petitioner on notice of a possible police investigation of his clothing and effects, as they were previously inspected on August 20, 1997, pursuant to a legal inventory search, he was well aware that the police had dominion over the clothing and could exclude him from possessing it. So long as it was in police custody, he could not access the property himself and could not exclude others from the property. Petitioner could have requested the release and exchange of his clothing to a third person, but did not. He simply had no control over who viewed his lawfully stored property. Taking all of these facts into account, it strains the imagination to see how a reasonable person would think that an individual would have a privacy interest in visibly stained clothing being held by the police in a jail when the individual had no control over it or who viewed it. As stated by one of our sister courts, "[n]o situation imaginable is as alien to the notion of privacy than an arrestee sitting in a jail cell, completely separated from his effects that are lawfully controlled and inventoried by the very police that are investigating him." *Oles,* 993 S.W.2d at 109.[12]

---

**12.** This Court's body of case law regarding legitimate expectations of privacy in the Fourth Amendment context other than in inventory searches supports this position. While none of our cases presented this Court with similar facts as those in the case at bar, they are illustrative that where detainees have severely limited, or no, control over their property, like petitioner in this case, any possible subjective expectation of privacy they have in that property may be clearly outside the boundaries of our notion of what constitutes a reasonable expectation of privacy. *See State v. Sampson,* 362 Md. 438, 765 A.2d 629 (2001)(holding that the defendant had no reasonable expectation of privacy in her trash bags because the trash, although within the curtilage of her home, was placed for collection in a readily accessible area, thus exposing it to the public and third persons); *In re Patrick Y.,* 358 Md. 50, 746 A.2d 405 (2000)(holding that a student had no reasonable expectation of privacy in a temporarily assigned locker at his school pursuant to section 7–308 of the Education Article of the Maryland Code and the Fourth Amendment); *Owens,* 322 Md. 616, 589

■ Petitioner, however, argues that the reasoning in *Edwards* and *Holland* is distinguishable due to the fact that the items in those cases were collected as evidence for the crimes in which those defendants were being held. This contention has no merit. An officer's investigatory motive is not an element of the Supreme Court's test to determine whether an individual has a legitimate expectation of privacy. It is, therefore, in this context, irrelevant. The test deals only with the *individual's*, not the police officer's, subjective expectation of privacy and whether that expectation is a reasonable one. Creating such an artificial distinction turning on whether the evidence was seized or searched for in respect to the incarcerating crime or in respect to a different crime could lead to arbitrary and absurd results.[13] Again, the essential determination is the reasonableness of the expectation of privacy of the suspect. Other jurisdictions have similarly resolved this issue and refused to accept such a distinction.[14]

---

A.2d 59 (holding that a defendant had no reasonable expectation of privacy in a friend's apartment or in the seizure of the defendant's bag, but that he had a reasonable expectation of privacy in the contents of the bag where the friend consented to a search of the home and did not have permission to open the bag and where the bag was zipped, labeled with the defendant's name and not exposed to public view); *Faulkner v. State*, 317 Md. 441, 564 A.2d 785 (1989)(holding that the defendant had no reasonable expectation of privacy in a second work locker at a private business where management could conduct general searches of lockers when they had a reasonable basis to believe that drugs were being used on a certain shift, there were known procedures for such searches, management cut off locks on lockers that periodically needed to be cleaned, the defendant denied use of the second locker as it was company policy to have only one locker).

13. For instance, an individual is suspected of committing crime "A," but is arrested for crime "B" by an officer with knowledge of the individual's status as a suspect for crime "A." Under petitioner's view, if that officer conducted a valid search incident to arrest or inventory search for crime "B," the officer would be precluded from using legally discovered evidence of crime "A" if he or she hoped to find evidence of crime "A." However, the police could return to the stored property over and over to search for evidence of crime "B." Relying on such a distinction creates an illogical result.

14. *See Jenkins*, 496 F.2d 57 (permitting a federal agent's second look at items taken by state police pursuant to a valid arrest on state charges);

Petitioner also argues that the length of time, ten days, between petitioner's incarceration and Corporal Harsh's actions are enough to distinguish *Edwards* and *Holland.* Generally, the length of time, without more, is of no relevance. Once the expectation of privacy is lawfully lost, it does not exist, unless such an expectation arises again by some subsequent action. It would logically appear that the longer the police had dominion and control over the property, thus excluding a prisoner from that same property, the less reasonable the prisoner's expectation of privacy in that property would be. Regardless, as we have discussed, the passage of time does not increase one's expectation of privacy in property held by the police.[15] This proposition is supported in *Ed-*

---

*Thompson,* 837 F.2d 673 (the defendant had no reasonable expectation of privacy with respect to property taken from him pursuant to a valid inventory search regardless of the fact that the defendant was arrested on state charges); *Hilley,* 484 So.2d 485 (although the defendant was arrested on separate charges, she had no reasonable expectation of privacy in her purse); *Gunn,* 112 Cal.App.3d 970, 169 Cal.Rptr. 559 (citing *Edwards,* no expectation of privacy involved when the property was lawfully in the custody of the police even though the second search, occurring within 24 hours, was to obtain evidence for a different crime); *Copridge,* 260 Kan. 19, 918 P.2d 1247 (no reasonable expectation of privacy in lawfully inventoried property where the defendant was arrested on unrelated charges); *Oles,* 993 S.W.2d 103 (second search valid where the officer was looking for evidence of murder and the defendant was being held on revocation of probation); *Williams,* 259 Va. 377, 527 S.E.2d 131 (second search permissible for murder investigation when the defendant's clothing was inventoried pursuant to an arrest on an unrelated charge); *Betterley,* 191 Wis.2d 406, 529 N.W.2d 216 (no reasonable expectation of privacy in a ring being held pursuant to an inventory search on unrelated charges).

15. Numerous courts have found the passage of time not to be an essential factor when the police legally possess the property and have maintained continuous possession between the initial seizure and the subsequent one. *See Jenkins,* 496 F.2d 57 (permitting a federal agent's second look eight days after the initial inventory); *Thompson,* 837 F.2d 673 (the second search taking place several days after the arrest and initial search); *United States v. Oaxaca,* 569 F.2d 518 (9th Cir.), *cert. denied,* 439 U.S. 926, 99 S.Ct. 310, 58 L.Ed.2d 319 (1978)(citing *Edwards,* holding that a police search of defendant's shoes six weeks after his arrest on the same charge was permissible); *Hilley,* 484 So.2d 485 (the second search took place nearly one month after the defendant was arrested); *State v. Carriger,* 123 Ariz. 335, 599 P.2d 788 (1979),

*wards,* where the Supreme Court discussed a lower court holding with approval when it stated:

> "[C]ases in the courts of appeals ... have long since concluded that once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the 'property room' of the jail, and at a later time searched and taken for use at the subsequent criminal trial."

*Edwards,* 415 U.S. at 807, 94 S.Ct. at 1239, 39 L.Ed.2d at 778.

Petitioner, at oral argument, proffered that detainees are not divested of all of their privacy rights because *Edwards* limited its holding based upon the reasonableness of what occurs. A similar proposition was argued by the defendant in *Oles* when he argued that the language in *Edwards* directly following the above quoted language limits its application. *Oles,* 993 S.W.2d at 107 n. 5. The subsequent language referred to in *Oles* states: "In upholding this search and seizure,

---

*cert. denied,* 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 736 (1980) (citing *Edwards,* permitting removal of keys from a briefcase taken pursuant to an arrest 97 days after that arrest); *Costello,* 231 Kan. 337, 644 P.2d 447 (no expectation of privacy in a ring where the second look took place two and a half months after the inventory search); *Natal,* 75 N.Y.2d 379, 553 N.Y.S.2d 650, 553 N.E.2d 239 (items were seized from the property room nine months after the inventory search and just one week before trial); *State v. Steen,* 352 N.C. 227, 536 S.E.2d 1 (2000), *cert. denied,* 531 U.S. 1167, 121 S.Ct. 1131, 148 L.Ed.2d 997 (2001) (second search occurring six days after valid inventory search); *Cheatam,* 112 Wash.App. 778, 51 P.3d 138 (no expectation of privacy in shoes when the second search occurred four days after the inventory search); *Marquez,* 754 P.2d 705 (holding that the defendant had no expectation of privacy in boots stored in a police property room notwithstanding the fact that the second search took place months after the inventory search).

we do not conclude that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee." *Edwards,* 415 U.S. at 808, 94 S.Ct. at 1239, 39 L.Ed.2d at 778. The Supreme Court, however, cited to certain cases when it expressed such concerns "which might 'violate the dictates of reason either because of their number or their manner of perpetration.' *Charles v. United States,* 278 F.2d 386, 389(C.A.9), *cert. denied,* 364 U.S. 831, 81 S.Ct. 46, 5 L.Ed.2d 59 (1960). *Cf. Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)." *Edwards,* 415 U.S. at 808 n. 9, 94 S.Ct. at 1239 n. 9, 39 L.Ed.2d at 778 n. 9. *Schmerber* and *Rochin* involve warrantless searches which severely intruded on the physical autonomy of an individual. *Schmerber,* while permitting the officer's actions on exigency grounds, was a case in which officers forcibly took a blood sample from an individual, while *Rochin* was a case where the Supreme Court found a violation of a defendant's due process rights as the officers' actions "shocked the conscience" when officers broke into an individual's home, tackled him and forcibly pumped his stomach. The graphic and abusive intrusions by the officers in those cases highlight the true concerns of the Supreme Court in its qualifying language mentioned above.

Corporal Harsh's actions in the present case, in no way, reflect the type of actions that "shock the conscience" or which would "violate the dictates of reason." In fact, an objective view of Corporal Harsh's actions illustrate their reasonableness. Once Corporal Harsh realized the possible evidentiary value of the property, he acted to preserve it. He did no more than the officer who viewed the clothing when it was first taken. After comparing witness accounts with the property record, Corporal Harsh was aware that the clothing in the property room was similar to the clothing the suspect in the homicide was alleged to be wearing on the day of the crime he was investigating. As the property was in police possession at the time and the defendant thus had no reasonable expectation of privacy in it, Corporal Harsh had ample

cause to immediately search the property for potential evidence. However, Corporal Harsh instead secured the property so that he could obtain the advice of the State's Attorney's Office. He actually took the cautious route by not immediately searching the clothing. In essence, his actions were akin to leaving the clothing in the jail side property room and issuing a hold on any possible release. In either case, petitioner's clothing would have remained in a police custody in one of the property rooms. In addition, only after obtaining a search warrant did the police submit the clothing for testing. The Fourth Amendment's exclusionary rule's purpose in deterring police and government misconduct [16] is not violated by an officer who chooses to secure potential evidence already being legally held by the authorities (which he has an immediate right to search), seeks advice from counsel and then further searches the evidence pursuant to a warrant.

### III. Conclusion

 In conclusion, we hold that an incarcerated individual, generally, does not have a reasonable or legitimate expectation of privacy in property legally seized and lawfully stored in police custody by law enforcement officials. Subsequent searches or seizures of that property by law enforcement officials normally do not violate that individual's Fourth Amendment protections. We affirm.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

---

16. *See Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 454 (1963); *Ferguson v. State,* 301 Md. 542, 548, 483 A.2d 1255, 1258 (1984).